FILED
United States Court of Appeals
Tenth Circuit

**June 28, 2011**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

ALEX MAESTAS,

      Defendant-Appellant.

No. 10-2204

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:CR-09-02963-LH-1)**

Santiago E. Juarez, (Dennis W. Montoya, Montoya Law, Inc., Rio Rancho, New Mexico, with him on the briefs), Santa Cruz, New Mexico, for Defendant-Appellant.

Fred Federici, Assistant United States Attorney, (Kenneth J. Gonzales, United States Attorney, and George C. Kraehe, Assistant United States Attorney, on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

Before **BRISCOE,** Chief Judge, **EBEL** and **HOLMES**, Circuit Judges.

**BRISCOE**, Chief Judge.

Defendant/appellant Alex Maestas appeals the district court's conclusion

that the sentencing enhancement § 2B1.1(b)(13) of the United States Sentencing

Guidelines Manual (U.S.S.G.) should apply in calculating his sentence. Section 2B1.1(b)(13) increases a defendant's offense level if the offense "involved . . . the conscious or reckless risk of death or serious bodily injury." Maestas attempted to steal a piece of gold from Los Alamos National Laboratory (LANL) and pled guilty to theft of government property in violation of 18 U.S.C. § 641. The gold was contaminated with plutonium. The district court applied the U.S.S.G. § 2B1.1(b)(13) enhancement and sentenced Maestas to a term of imprisonment of twelve months and a day, which was within the calculated guideline range. Maestas argues that the enhancement can only apply if the government proves that he was aware of the risk his conduct created, and that he consciously or recklessly disregarded that risk. He also challenges the district court's factual findings that the gold was dangerous, and that he was aware of that danger. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I

Maestas had worked for over ten years as a technician in Plutonium Facility Four (PF-4) at LANL. He worked in Room 401, an area where waste material generated during the production of nuclear weapons is processed to reclaim residual plutonium. In PF-4, radioactive materials are stored in a series of interconnected sealed chambers or "glove boxes." To avoid the risk of contaminating the area outside of the glove boxes, a technician manipulates items in the glove boxes by using rubber gloves which are permanently attached to the

2

box. One of Maestas's co-workers stated to investigators that "[e]verything which is in or has been in the glove box line must be presumed to be contaminated [with radioactive material]. Anyone who has worked in PF-4 for more than a few days understands this, and has it beaten into them repeatedly." ROA, Vol. 1 at 67.

On March 24, 2009, Maestas was attempting to leave PF-4 during the lunch hour when he set off the Personnel Contamination Monitor (PCM-2), a radiation detector. Maestas was found to be carrying a piece of gold that was contaminated with plutonium. The gold was a piece of solder that had been used to repair a "boat" used to melt materials containing plutonium. Id. at 63. These boats were stored in the glove boxes in Room 401. Id.

After the PCM-2 was triggered, Maestas told the radiation control technician on duty that the package he was carrying (which should have been presented to the technician and separately assessed) probably set off the monitor. After the technician determined that the package was radioactive, Maestas suggested that he would just return it to the glove box line. Id. at 85. The gold piece was wrapped in yellow tape, which is used at LANL to identify radioactive or contaminated material. Maestas admitted to investigators that he knew that yellow tape was used to identify radioactive material. Id. at 59. Maestas attempted to explain his actions by claiming that he was bringing the gold to someone in the machine shop, although he could not remember who asked him to

3

bring it there, or why. Maestas's explanation was not plausible for a number of reasons, including the fact that no material from PF-4 would be taken to the machine shop because the machine shop was a "cold" area, i.e., it did not contain any radioactive material.

According to Maestas, he scanned the gold with the Hand and Foot Monitor (HFM-8) prior to leaving Room 401, and the gold did not set off the monitor. Id. Technicians use the HFM-8 to check their hands and feet for radiation contamination prior to leaving Room 401. The HFM-8 detects only alpha radiation and might not have detected the plutonium in the gold Maestas took because most of the plutonium was incorporated within the gold. Alpha particles would be detected if they were emitted on the gold's surface, but not if they were emitted from plutonium within the gold.[1] In contrast, the PCM-2 located at PF-4's exit detects beta and gamma radiation, and in this instance detected the beta particles emitted by the plutonium within the gold. See id. at 65. A LANL employee reported that Maestas was surprised when the gold set off the PCM-2, but had not set off the HFM-8. When the employee explained the difference between the two detectors, Maestas "got a shocked look on his face, and admitted

_____

[1] Plutonium emits both alpha and beta radiation. Alpha particles travel only a short distance and have limited penetration power. An alpha particle can be stopped by something as thin as a sheet of paper. In contrast, beta particles travel further and have greater penetration power. See ROA, Vol. 1 at 26. The primary concern at sentencing was alpha radiation emitted by the plutonium.

that he had not known, or had not remembered, that the PCM-2 detected beta radiation." Id. at 68.

Both Maestas's direct supervisor, Mary Ann Stroud, and the Technical Advisor to LANL's Radiological Protection Division, Paul Hoover, were of the opinion that Maestas had tried to decontaminate the gold prior to removing it from PF-4. They based their opinions on the waste collected after the incident. The day after the incident, the "clean" waste from Room 401 was collected, and the waste was found to be contaminated with plutonium in the same proportion as the gold Maestas had in his possession. Id. at 79. This indicated that Maestas "decontaminated something which had been exposed to the gold, either the surface of the gold itself, the packaging the gold was in, or the gloves he used to handle the gold. He then disposed of the materials he used to do the decontamination . . . in the clean waste." Id.

II

Maestas was ultimately charged with one count of theft of government property, and one count of theft of nuclear material. Pursuant to a plea agreement, Maestas pled guilty to theft of government property and the government agreed to dismiss the theft of nuclear material charge. The presentence report (PSR) assigned Maestas a base offense level of 6. The probation officer recommended application of the U.S.S.G. § 2B1.1(b)(13) enhancement, which increased Maestas's offense level to 14. Two levels were

5

subtracted for acceptance of responsibility, resulting in a total offense level of 12. Maestas had no criminal history points, resulting in a criminal history category of I and a guideline sentencing range of ten to sixteen months of imprisonment.

Maestas objected to the PSR, specifically objecting to the application of the U.S.S.G. § 2B1.1(b)(13) enhancement. Maestas contended that he did not know that the gold he had in his possession when he tried to leave PF-4 was radioactive. Id. at 40. He argued that he used the HFM-8 as a "precaution[ ] to ensure that the item he was planning to take from the laboratory was not radioactive." Id. at 41. He further argued that, because he was not aware that the gold was radioactive, he could not have consciously or recklessly risked death or serious bodily injury to others. Id. at 42.

Maestas also argued that the gold did not pose a significant health risk to others. The evidence presented by the government at sentencing showed that a person who merely touched the gold would not be at risk of developing radiation-related sickness.[2] The government presented, as part of its evidence at sentencing, an article published in the journal Los Alamos Science. The article explained that, because alpha particles do not penetrate human skin, "alpha emitters [like plutonium] are hazardous to human health only when they have found their way into the body. [However, w]hen inhaled, ingested, or passed

_____

[2] However, radiation contamination would remain on that person's skin and the person would, in turn, contaminate other objects that he or she touched.

6

through the blood stream through a wound, plutonium deposits in the lungs, liver, or bones." Id. at 27. The article went on to explain that plutonium has a long half-life and, once deposited in the body, it can be a long-term source of radiation. "A few millionths of a gram . . . distributed through the lungs, liver, or bones may increase the risk for developing cancer in those organs." Id.

The government argued that there was a risk that plutonium would be incorporated into a person's body if the gold were melted, as would occur if processed to make jewelry. The LANL Radiological Protection Division's Technical Advisor, Hoover, stated to investigators that the health risks of processing the gold were unclear. He stated that, "[i]f the gold were melted-down, it is possible that a significant amount of plutonium might be aerosolized and released into the air. Other processing of the gold might potentially cause the incorporated plutonium to come to the surface, thereby potentially exposing anyone who handled the gold." Id. at 78-79. Maestas's counsel challenged these views at sentencing, asserting—without support—that "if it had been sold to someone who was going to melt it down for jewelry . . . that process in and of itself would have eliminated much of the plutonium or much of the danger . . . ." ROA, Vol. 3 at 31. Maestas did not offer any explanation regarding his intended use of the gold.

The district court adopted the PSR and applied the enhancement. It found that Maestas knew that items stored in the PF-4 glove boxes were radioactive and

7

that contact with radioactive items is dangerous to humans. The district court did not credit Maestas's argument that he scanned the gold to make sure it was safe, and found instead that Maestas used the HFM-8 "in an attempt to determine whether or not he would be caught." Id. at 69. Ultimately, the district court found that Maestas "knew that there was a substantial risk of radioactive danger to any person who might be exposed to [the gold] and that he attempted to steal it in spite of that, and that's reckless." Id. The district court sentenced Maestas to a term of imprisonment of twelve months and a day.

III

In reviewing the district court's application of the sentencing guidelines, this court reviews legal questions de novo and reviews factual findings for clear error, "giving due deference to the district court's application of the guidelines to the facts." United States v. Doe, 398 F.3d 1254, 1257 (10th Cir. 2005) (internal quotation omitted). "A finding of fact is clearly erroneous only if it is without factual support in the record or if the appellate court, after reviewing all of the evidence, is left with a definite and firm conviction that a mistake has been made." United States v. Talamante, 981 F.2d 1153, 1158 (10th Cir. 1992) (internal quotation omitted).

IV

Section 2B1.1(b)(13) of the U.S.S.G. provides the following enhancement to a defendant's base offense level for theft and fraud offenses:

8

If the offense involved (A) the conscious or reckless risk of death or serious bodily injury;[3] or (B) possession of a dangerous weapon (including a firearm) in connection with the offense, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14.

First, Maestas argues that, in order for the enhancement to apply, the government was required to show that he was subjectively aware of the risk he created and that he consciously or recklessly disregarded it. Second, Maestas argues that the district court erred when it found that the gold in his possession was dangerous and that he was aware of this danger. We conclude that § 2B1.1(b)(13) does not require the government to establish that a defendant was subjectively aware of the risk created by his or her acts. We affirm the district court's application of the enhancement to Maestas.

*Mental state required under the § 2B1.1(b)(13) enhancement*

The district court did not specifically apply a mens rea requirement in concluding a § 2B1.1(b)(13) enhancement applied, but concluded that Maestas acted recklessly by attempting to steal the gold in spite of his knowledge that the gold posed a danger of radioactive contamination. Maestas argues that the government was required to prove that he was "in fact aware of and consciously or recklessly disregarded [the] risk" that his conduct created. Aplt. Opening Br.

---

[3] "Serious bodily injury" is "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1 cmt. n.1(L).

9

at 12. Although the district court's findings satisfy the standard Maestas proposes and we could affirm on this basis alone, we provide the following analysis in order to clarify the mens rea required under § 2B1.1(b)(13).

The Sentencing Commission has provided no commentary to U.S.S.G. § 2B1.1(b)(13), and this court has not previously discussed what constitutes a "conscious or reckless risk" under this guideline. The term "reckless" is defined elsewhere in the guidelines, in the application notes to the guideline relating to involuntary manslaughter. See U.S.S.G. § 2A1.4 (prescribing an increased base offense level "if the offense involved reckless conduct"). In the context of involuntary manslaughter, "'[r]eckless' means a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 2A1.4 cmt. n.1.

Relying on the involuntary manslaughter definition of reckless, the Eighth Circuit held in United States v. McCord, Inc., 143 F.3d 1095 (8th Cir. 1998), that the § 2B1.1(b)(13) enhancement requires the government to "prove not only that the fraudulent conduct created a risk of serious bodily injury, but also that each defendant was in fact aware of and consciously or recklessly disregarded that

10

risk."[4] Id. at 1098. Thus, under the Eighth Circuit's interpretation, the defendant must be subjectively aware of the risk created by his or her conduct. The Eighth Circuit distinguished between a reckless risk and conscious risk as follows: a reckless risk is a known risk that is recklessly disregarded, whereas a conscious risk is a known risk that is consciously disregarded. Maestas asks this court to adopt the Eighth Circuit's interpretation.

The Second and Ninth Circuits were not persuaded by the Eighth Circuit's interpretation, and concluded that § 2B1.1(b)(13) does not require the government to prove that the defendant was subjectively aware of the risk. In United States v. Johansson, 249 F.3d 848 (9th Cir. 2001), the Ninth Circuit declined to follow McCord and identified a significant problem with the Eighth Circuit's interpretation of reckless risk: "there is no meaningful distinction between an offense that involves the 'conscious' risk of injury, and an offense that involves the 'reckless' risk of injury, if under either prong the defendant must have been aware of the risk in the first place." Id. at 858. The Johansson court was not convinced by the Eighth Circuit's distinction between conscious and reckless risk. It stated:

The Eighth Circuit appears to distinguish between a 'conscious risk'

---

[4] However, the Eighth Circuit also suggested that a different rule might apply where the defendant's conduct involved "such obvious risks of serious bodily injury that the criminal recklessness of [the defendant] will be self-evident . . . ." McCord, 143 F.3d at 1098.

11

and a 'reckless risk' by holding that an offense involves [a] 'conscious risk' when a defendant is aware of the risk but consciously disregards the risk, and an offense involves a 'reckless risk' when the defendant is aware of the risk but recklessly disregards the risk. Such an interpretation, however, deviates from the plain language of the Guideline. The Guideline describes a 'reckless risk,' not a reckless disregard of a known risk. We do not believe that the defendant can escape the application of the serious risk of injury enhancement by claiming that he was not aware that his conduct created a serious risk, that is, a defendant does not have to subjectively know that his conduct created the risk.

Id. at 859. Two years later, in United States v. Lucien, 347 F.3d 45 (2d Cir. 2003), the Second Circuit adopted the Ninth Circuit's approach, holding that "a defendant does not have to subjectively know that his or her conduct created a serious bodily risk . . . ." Id. at 56.

We join the Second and Ninth Circuits and hold that the government does not have to prove that the defendant was actually aware of the risk of serious bodily injury or death when seeking a § 2B1.1(b)(13) enhancement. First, we conclude that the McCord court's reliance on the definition of "reckless" in the involuntary manslaughter guideline is misplaced.[5] The involuntary manslaughter guideline provides an enhancement for "reckless conduct," U.S.S.G. § 2A1.4(a)(2)(A), whereas § 2B1.1(b)(13) provides an enhancement for a "reckless

---

[5] We note that the Sentencing Commission did not include an application note to § 2B1.1 referencing the involuntary manslaughter definition of reckless. The Commission did, however, include cross-references to other definitions from other guidelines. See, e.g., § 2B1.1 cmt. n.1 ("'Firearm' and 'destructive device' have the meaning given those terms in the Commentary to § 1B1.1 (Application Instructions).").

12

risk." We also agree with the <u>Johansson</u> and <u>Lucien</u> courts that the Eighth Circuit's interpretation renders the guideline's use of the terms "conscious" and "reckless" redundant. We generally assume that the use of the disjunctive "or" indicates that terms separated by the word are to have different meanings. <u>United States v. Gonzales</u>, 456 F.3d 1178, 1182 (10th Cir. 2006). However, as interpreted by the Eighth Circuit, there would no meaningful distinction between consciously disregarding a known risk and recklessly disregarding a known risk. Finally, we reject a subjective awareness requirement because a defendant should not be able to escape the consequences of committing theft or fraud that puts others in bodily danger by claiming ignorance of the risk he or she created.

We interpret the guideline to require the defendant to have been conscious of <u>or</u> reckless as to the existence of the risk created by his or her conduct. Generally, recklessness is an objective standard, and we interpret "reckless risk" to describe objectively culpable conduct. We hold that a defendant's conduct involves a conscious risk if the defendant was subjectively aware that his or her conduct created a risk of serious bodily injury, and a defendant's conduct involves a reckless risk if the risk of bodily injury would have been obvious to a reasonable person.[6]

---

[6] The Second Circuit held that the guideline requires the risk to "have either been known to the defendant (conscious), or, if unknown to the defendant, the type of risk that is obvious to a reasonable person and for which disregard of

(continued...)

13

*Application of the enhancement in this case*

Maestas challenges the district court's findings that the gold posed a health risk and that Maestas was aware of this risk. We affirm the district court's findings because they are supported by sufficient evidence. Further, we note that the district court's findings would be sufficient to support application of the enhancement even under Maestas's proposed construction because the district court found that Maestas was subjectively aware that the gold was radioactive and dangerous.

As a preliminary matter, Maestas argues that the district court was required to find "extraordinary circumstances" in order to apply the enhancement. Aplt. Opening Br. at 7-8. Maestas confuses an offense level enhancement with an upward variance.[7] The government must prove the facts necessary to support a guideline enhancement by a preponderance of the evidence. United States v.

_____

[6](...continued)
said risk represents a gross deviation from what a reasonable person would do (reckless)." Lucien, 347 F.3d at 56-57. We decline to adopt this standard verbatim because it suggests that the risk must be more substantial if the defendant was not actually aware of it (because disregard must be a gross deviation from what a reasonable person would do) than if he or she was actually aware of it (in which case the reasonableness of the disregard is irrelevant). We interpret the modifiers "conscious" and "reckless" to apply to the defendant's mental state regarding the existence of the risk, rather than the magnitude of the risk.

[7] Further, in United States v. Gall, 552 U.S. 38, 47 (2007), the Supreme Court rejected "an appellate rule that requires 'extraordinary circumstances' to justify a sentence outside the Guidelines range."

14

Tindall, 519 F.3d 1057, 1063 (10th Cir. 2008).

Maestas concedes in his opening brief that "[t]here can be no question but [sic] that the substance stolen posed some kind of risk . . ." and that "it is fortunate that the stolen substance did not leave the laboratory for it might, then, have done some harm." Aplt. Opening Br. at 10, 8. He thus appears to concede that, if he had succeeded in taking the gold out of LANL, it would have posed a health risk. However, he also contends that the government's evidence "at best was equivocal as to the danger posed by the stolen item and the manner in which it might pose a threat." Id. at 12.

The district court's finding that the radioactive gold posed a danger of serious bodily injury or death was not clearly erroneous. The gold was contaminated with a significant amount of plutonium. The removable contamination on just the surface of the gold piece far exceeded the federal Annual Limit on Intake for plutonium exposure for both the general public and nuclear workers. ROA, Vol. 3 at 53; ROA, Vol. 1 at 80. The government presented evidence—in the form of an article in LANL's science journal and the opinions of persons knowledgeable in nuclear safety—that the plutonium contained in the stolen gold piece could be extremely harmful if it entered a person's body. Contrary to Maestas's suggestion, the government was not required to prove that the gold would certainly be incorporated into a person's body in order to prove that it posed a risk of bodily harm. The government need

15

not show that serious bodily injury was certain or even highly likely to occur; it must only show that there was a risk it would occur. Cf. United States v. Babul, 476 F.3d 498, 503 (7th Cir. 2007) (noting that the guideline speaks of "risk" rather than "substantial" or "material" risk, and concluding that the defendant's crime created "some risk"). The district court concluded that an inherent risk of stealing radioactive material was that "you can't determine how it's going to be used." ROA, Vol. 3 at 68. Without any knowledge of the source of the gold, any person who came into contact with it would have no reason to know or suspect that it was radioactive. See id. at 28-29. One significant risk was that the gold would be melted down, which might cause the plutonium to come to the gold's surface or to be aerosolized.

Maestas also argues that the district court erred in finding that he was aware that the gold he took was dangerous. The district court could reasonably infer from Maestas's employment history that he was aware of the dangers of radiation. See id. at 68 ("He knew from his experience of 12 years working in this area and with these materials that radioactivity contained in the materials was dangerous. As a matter of fact, it was so dangerous that they handled the material through these glove boxes which protected the operators from the radioactivity."). One of Maestas's supervisors, Thomas Ricketts, reported to investigators that Maestas was extremely inquisitive and cautious about the handling of radioactive materials. As a result, Ricketts would have to explain a procedure in detail to

16

Maestas before Maestas would be satisfied that it was safe to perform. ROA, Vol. 1 at 65. At the sentencing hearing, Maestas admitted that he "kn[e]w something about radioactivity." ROA, Vol. 3 at 25.

The district court could also reasonably infer that Maestas was aware that the gold he removed from Room 401 was radioactive. The gold was taken from a boat used to melt plutonium. It was stored in a sealed glove box. The gold was wrapped in yellow tape, which Maestas knew signified radioactive contamination. There was evidence that Maestas attempted to decontaminate the gold. Maestas argues that he could not have known that the gold was radioactive because the HFM-8 did not detect radiation when he scanned it. However, the district court drew a different inference from Maestas's use of the HFM-8, concluding that Maestas used the monitor "in an attempt to determine whether or not he would be caught." Id. at 69. This finding is supported by the evidence and is not clearly erroneous. The evidence presented at sentencing is sufficient to support the district court's findings that Maestas knew the gold was contaminated with plutonium and that he knew of the health risks his conduct created. These findings are sufficient to support the district court's application of the U.S.S.G. § 2B1.1(b)(13) enhancement.

The judgment of the district court is AFFIRMED.