**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 17, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JAMES A. McKEIGHAN,

Defendant - Appellant.

No. 08-3204

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 2:06-CR-20066-JWL-1)

---

Jessica R. Kunen, Lawrence, Kansas, appearing for Appellant.

James A. Brown, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with him on the brief), Office of the United States Attorney for the District of Kansas, Topeka, Kansas, for Appellee.

---

Before **LUCERO, HOLLOWAY,** and **MATHESON,** Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

In 2007, James McKeighan was convicted on four federal charges relating to his possession of firearms, marijuana, and methamphetamine. He now raises three claims of

error.  First, he argues that the Government and the district court forced his attorney of choice to withdraw, violating his rights under the Sixth Amendment to the U.S. Constitution.  Second, he asserts that jurors fell asleep during his trial, depriving him of the right to an impartial jury under the Sixth Amendment.  Finally, Mr. McKeighan argues that the district court erred when it enhanced his sentence for obstruction of justice.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm Mr. McKeighan's conviction and sentence.

## I.    BACKGROUND

### A. *Pre-Trial*

#### 1. *Arrest and Indictment*

In April 2006, law enforcement officers executed a warrant to search a storage unit rented by Mr. McKeighan in Kansas City, Kansas.  Inside the unit, officers discovered firearms, ammunition, approximately 109 pounds of marijuana, 40.7 grams of methamphetamine, and drug paraphernalia.  Officers also seized $41,170 in U.S. currency, as well as documents and credit cards in Mr. McKeighan's name.

As a result, Mr. McKeighan was arrested and indicted on four counts related to the possession of drugs and firearms.[1]

---

[1] Specifically, Mr. McKeighan was charged with the following: (1) possession with intent to distribute five grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii); (2) possession with intent to distribute marijuana,

Continued . . .

## 2. *Mr. McKeighan's Counsel and Discovery Regarding His Fee*

After his initial retained counsel withdrew, Mr. McKeighan retained Texas attorney Baltazar Salazar ("Attorney Salazar"). On June 19, 2006, Kansas attorney Melanie Morgan ("Attorney Morgan"), acting as local counsel, moved for Attorney Salazar to appear *pro hac vice* in the U.S. District Court for the District of Kansas. On June 30, 2006, the district court granted the *pro hac vice* motion.

On July 26, 2006, the Government filed a motion seeking to withhold production of discovery to Mr. McKeighan until it received more information about Attorney Salazar's fee. The Government explained that before Attorney Salazar was retained, Mr. McKeighan told law enforcement and pretrial services that he had no income or money. Attorney Salazar's fee was $25,000.[2]

In its motion, the Government alleged that Attorney Salazar had rejected its request that he identify the date of his retention, the amount of his fee, the method of payment, the name of any third party who paid Mr. McKeighan's fee, and the financial institution and account number into which the fee was deposited. The Government

---

Cont.

in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D); (3) felon in possession of firearms and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (4) possession of a firearm not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871, with reference to 26 U.S.C. § 5845(a) and (f).

[2] Attorney Morgan received $5,000 of the $25,000 fee.

asserted it had "substantial evidence that [Mr. McKeighan was] engaging in continuing criminal activity" and that it was concerned that Attorney Salazar's representation of Mr. McKeighan might pose a conflict of interest. ROA, Vol. 1, Doc. 29, at 2. According to the Government, it had "substantial evidence that would allow for the fee paid to [Attorney Salazar] to be subject to criminal seizure and forfeiture." *Id.*

At a hearing on August 21, 2006, the district court stated it lacked information to rule on the Government's motion. The court permitted the Government to provide a sealed ex parte submission to support the motion by September 1, 2006. The court scheduled a status conference for September 11, 2006, to consider any Government submission.

On August 31, 2006, Attorney Morgan moved to withdraw as Mr. McKeighan's local counsel, stating that "a conflict of interest has arisen in the case." ROA, Vol. 1, Doc. 33, at 1. The next day, the Government provided its sealed ex parte submission to the court concerning the fees paid to Attorney Salazar and the potential conflicts of interest in his representation of Mr. McKeighan.

### 3. *September 11, 2006 Hearing*

#### a. *Mr. McKeighan's Fee*

At the September 11, 2006 hearing, the district court began by granting Attorney Morgan's motion to withdraw. Consequently, the court explained that it could not consider any other motions—including the Government's motion to withhold discovery and its supporting ex parte submission—until Attorney Salazar obtained local counsel to

support his *pro hac vice* admission.

Attorney Salazar had received several federal grand jury subpoenas regarding his fee information. He told the court it would be difficult to secure local counsel "because if I explain . . . that the prosecutor's going after the funds, that I have been given three grand jury subpoenas, no one's going to want to touch the case, your Honor." ROA, Vol. 2, Pt. 2, Doc. 341, at 7. He felt he was "being strongarmed into withdrawal." *Id.*

Attorney Salazar then explained that he had placed Mr. McKeighan's fee in a trust account and feared that "if a federal grand jury subpoena or money seizure shows up in my trust account, it will automatically ring bells to the Texas State Bar" and "[t]he bank will not want to touch me." *Id.* at 12. He stated, "I don't have any problem placing that money, my attorneys' fees, in the court's registry . . . if the court orders." *Id.* He repeated multiple times his willingness to place Mr. McKeighan's fee in the court's registry.

The district court responded, "Mr. Salazar, it would seem like it might be helpful to you as well as the [G]overnment if [the court] made the order *as you have suggest[ed]* that would trigger you transferring those fees to the registry of the court." *Id.* at 14 (emphasis added). The court then ordered the transfer of the attorney fee into the court's registry. Attorney Salazar clarified for the record that he was "putting [the fee] in the registry of funds *voluntarily*, not per the [grand jury] subpoena." *Id.* at 46 (emphasis added). On September 13, 2006, Attorney Salazar transferred Mr. McKeighan's fee into

-5-

the court's registry.[3]

**b.** *Potential Conflicts of Interest*

At the hearing, the district court also informed Mr. McKeighan of four conflicts of interest that could arise were he to continue with Attorney Salazar as his counsel.

First, Mr. McKeighan's longtime girlfriend, Leigh Bledsoe, had delivered Mr. McKeighan's fee to Attorney Salazar, and she could be charged as a co-conspirator who had delivered drug proceeds to pay Attorney Salazar's fee.

Second, if the funds came from someone in a higher position in the alleged criminal enterprise, Attorney Salazar's loyalty to Mr. McKeighan might be compromised.

Third, the Government might determine that Attorney Salazar engaged in illegal activity in accepting the fee, which would make it "virtually impossible" for him to continue his representation. *Id.* at 24.

Fourth, Attorney Salazar's fee might be forfeited as proceeds of illegal activity. If that happened, Mr. McKeighan might find Attorney Salazar's free representation to be ineffective.

In describing these potential conflicts, the court made clear that it was "simply giving . . . examples of what could happen." *Id.* It was "not admonishing or indicting" Attorney Salazar, *id.* at 30, and was "not picking sides in all this," *id.* at 31. The court stated it was "not passing any judgment" on Attorney Salazar, *id.* at 43, and that Attorney

_____

[3]Attorney Morgan transferred her portion of Mr. McKeighan's fee into the court's registry on September 12, 2006.

Salazar had done nothing to give the court "any indication to think . . . that he's causing any problems for anybody," *id.* When asked whether he understood the points the court was making, Mr. McKeighan nodded his head yes.

The court then told Mr. McKeighan that if Attorney Salazar obtained local counsel and if Mr. McKeighan wanted to continue with Attorney Salazar's representation, the court would

> conduct some more formal proceedings to assure . . . that you not only have been exposed to all these risks . . . [described] today, but that . . . if you want Mr. Salazar as your lawyer, waive the ramifications of that, meaning that if you go to trial and get convicted, you cannot come back later and say, ["G]ive me a new trial, Judge. I never should have had Mr. Salazar as my lawyer.["] . . . *If you want Mr. Salazar, fine, but you're not going to come back later if you get convicted and say, [*"]Mr. Salazar shouldn't have been allowed to represent me because he was actually acting in somebody else's best interests, or wasn't getting paid, [and] therefore, didn't do a good job[."] . . . [I]f you said you wanted to stick with Mr. Salazar, I would be fairly inclined to say, as far as I'm concerned, we can move forward,* I can give you the conflict-of-interest-waiver colloquy, and if they indict Mr. Salazar . . . we will cross that bridge when we come to it.

*Id.* at 26-28 (emphases added).

On September 26, 2006, Attorney Salazar moved to withdraw as Mr. McKeighan's counsel. He stated that the "Government believes a conflict of interest may develop since discovering that a third party is paying [Mr. McKeighan's] . . . fees" and that he "has not been able to obtain assistance of local counsel as required by local rules" to continue his appearance *pro hac vice*. ROA, Supp. Vol. 2, at 50. The district court

granted the motion on September 28, 2006, and counsel was appointed for Mr. McKeighan.

### 4. *Money Laundering Count*

On February 28, 2007, the grand jury issued a superseding indictment adding a fifth count against Mr. McKeighan and his girlfriend, Ms. Bledsoe. Count Five charged Mr. McKeighan and Ms. Bledsoe with conspiring to commit money laundering in connection with the $25,000 fee paid to Attorney Salazar. The superseding indictment also alleged that the $25,000 fee—then held in the court's registry—was subject to criminal forfeiture pursuant to 18 U.S.C. § 982.

Ms. Bledsoe pled guilty to a reduced felony charge, and the Government dismissed Count Five against her. Mr. McKeighan proceeded to trial.

## B. *Trial*

### 1. *Michael Orr's Testimony*

Michael Orr, a witness for the prosecution, testified at trial that he had stored three guns in Mr. McKeighan's storage unit, had purchased marijuana from Mr. McKeighan, and had seen him with methamphetamine. Mr. Orr also testified that Ms. Bledsoe had contacted him after Mr. McKeighan's arrest. The two met, and Ms. Bledsoe asked Mr. Orr to sign a piece of paper. Mr. Orr signed the paper, which he assumed Ms. Bledsoe had written. However, Mr. Orr could not read what was on the note because he is legally blind and because the handwriting was illegible.

During this meeting, Mr. McKeighan spoke with Mr. Orr by telephone from jail.

Mr. Orr testified that Mr. McKeighan tried to get him to say that the majority of the items in the storage unit belonged to Mr. Orr's girlfriend, which Mr. Orr testified was untrue.

## 2. *Ms. Bledsoe's Testimony*

Ms. Bledsoe's testimony about her meeting with Mr. Orr was slightly different. She testified that she met with Mr. Orr after Mr. McKeighan's arrest and that the two men spoke over the phone while she was present. But according to Ms. Bledsoe, Mr. Orr drafted a note and signed it while he was talking on the phone with Mr. McKeighan. The note stated that the

> FBI came to apprehend [Mr. Orr's girlfriend]. On that search [agents] found [her] marijuana, and [she] was on the lease [of the storage unit]. She had one MAC-40 sports rifle stolen from her ex-boyfriend. [She] paid [Mr. McKeighan] to [store] stuff at his storage [unit], contents unknown. She also had stolen [a rifle and shotgun] . . . from [her] ex-boyfriend.

ROA, Vol. 2, Pt. 2, Doc. 337, at 244.

Ms. Bledsoe also testified to the following facts regarding the delivery of Mr. McKeighan's fee to Attorney Salazar. A friend of Mr. McKeighan's delivered the money to Ms. Bledsoe's home in approximately five installments. Ms. Bledsoe, who had been dating Mr. McKeighan intermittently for about 11 years, had seen the friend a long time ago and knew him as Charlie, although she did not know his last name or whether "Charlie" was his real name. Charlie told her the money came from the sale of a car and from collecting cash from friends and family.

Charlie delivered a total of between $27,000 and $28,000 in cash to Ms. Bledsoe. The money was packaged in rubber bands and consisted mostly of $20 and $50 bills. At

Ms. Bledsoe's home, Charlie "would just step inside the door and hand [her] cash, and that was it." *Id.* at 229. Ms. Bledsoe had concerns about where the money came from and thought "things were looking very suspicious." *Id.* at 235-36.

Ms. Bledsoe met Attorney Salazar on three occasions to pay him portions of Mr. McKeighan's fee—at an airport hotel restaurant, at a Wendy's restaurant, and outside the courthouse. Ms. Bledsoe brought the money in bags, and the bills were still bundled in rubber bands. Attorney Salazar did not give her receipts for the payments.

C. *Conviction and Post-Trial Motions*

After the prosecution presented its case, Mr. McKeighan moved for a judgment of acquittal. The court granted his motion only as to Count Five, which charged Mr. McKeighan with conspiring to launder the $25,000 paid to Attorney Salazar. The court concluded that "[t]here is not sufficient evidence from which a rational jury could find beyond a reasonable doubt that there was knowledge of this money coming from anything illegal." ROA, Vol. 2, Pt. 2, Doc. 338, at 95.

On December 19, 2007, the jury found Mr. McKeighan guilty on Counts One through Four of the superseding indictment. The same day, Mr. McKeighan filed a motion for a new trial asserting the district court "erred in ordering [Attorney Salazar] to disgorge and pay into court all sums paid to him . . . for the purpose of representing [Mr. McKeighan], thus effectively denying [Mr. McKeighan] his right to his choice of counsel in violation of the Sixth Amendment to the United States Constitution." ROA, Vol. 1, Doc. 227, at 1.

On January 8, 2008, Mr. McKeighan filed another new-trial motion. He again argued that he had been denied the right to counsel of his choice. He also alleged that three jurors "kept dozing off/falling asleep during the trial." ROA, Vol. 1, Doc. 246, at 2. On June 25, 2008, Mr. McKeighan made a third post-trial filing, alleging he was denied his rights under the Fifth and Sixth Amendments.

The district court denied Mr. McKeighan's post-trial motions in a sealed memorandum and order on July 24, 2008.

**D.** *Sentencing*

Mr. McKeighan's presentence investigation report recommended a two-level enhancement for obstruction of justice. *See* U.S.S.G. § 3C1.1. The enhancement was based on Mr. McKeighan's attempt "to obstruct justice by having Michael Orr, a federal witness, write a note that exonerated [Mr. McKeighan] from some of the charges filed against him." Aple. Br. at 13 (quotations omitted). Mr. McKeighan objected to the enhancement.

At Mr. McKeighan's sentencing hearing, the district court overruled his objection. The court was "persuaded from the testimony of Mr. Orr and that of Ms. Bledsoe that the . . . genesis for [the] note was Mr. McKeighan's attempt to get his friends to shift the blame to someone else for the items that were found in the storage unit and which ultimately led to the charges in this case." ROA, Vol. 2, Pt. 2, Doc. 342, at 14-15.

The district court sentenced Mr. McKeighan within the advisory guidelines range to 293 months on Count One and 120 months on each of Counts Two through Four. Mr.

McKeighan is serving his sentences concurrently.

**E.** *Appeal*

Mr. McKeighan filed a notice of appeal on July 25, 2008. His appeal was dismissed on March 5, 2009, for failure to file an opening brief. On May 17, 2011, Mr. McKeighan filed a pro se "Motion to Recall the Mandate and Reinstate Direct Appeal." This court issued an order on September 8, 2011, granting Mr. McKeighan's motion and reinstating his direct appeal. We appointed appellate counsel to represent Mr. McKeighan.

## II. DISCUSSION

Mr. McKeighan raises three issues on appeal. First, he argues that the Government and the district court violated his Sixth Amendment right to counsel of choice. Second, he contends that because jurors fell asleep during his trial, he was denied his Sixth Amendment right to an impartial jury. Third, Mr. McKeighan asserts the district court erred when it applied a sentencing enhancement for obstruction of justice.

We address each issue in turn.

**A.** *Sixth Amendment Right to Counsel of Choice*

**1.** *Substantive Background*

"The Sixth Amendment to the Constitution guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.'" *Wheat v. United States*, 486 U.S. 153, 158 (1988) (quoting U.S. Const. amend. VI). This guarantee includes the "right to be represented by an otherwise

-12-

qualified attorney whom [the] defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989). If a defendant is wrongly denied his counsel of choice, no showing of prejudice is necessary to establish constitutional error. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006). Such a deprivation is "structural error," *id.* at 150 (quotations omitted), and is "complete when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received," *id.* at 148 (quotations omitted).

Although there is a presumption in favor of a defendant's counsel of choice, the right is not absolute. *See Wheat*, 486 U.S. at 159, 164; *United States v. Collins*, 920 F.2d 619, 625 (10th Cir. 1990). For instance, "a defendant's right to choice of counsel is limited by the financial ability of the defendant to retain a desired attorney," *United States v. Nichols*, 841 F.2d 1485, 1504 (10th Cir. 1988), and a defendant does not have a right to counsel who declines representation, *Wheat*, 486 U.S. at 159. Nor does a defendant have a "constitutional right to use the proceeds of crime to finance an expensive defense." *Caplin & Drysdale*, 491 U.S. at 630 (quotations omitted); *see also Nichols*, 841 F.2d at 1505. Most relevant for this case, the right to counsel of choice must be consistent with the fair administration of justice. *See Collins*, 920 F.2d at 626.

Thus, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159. In a

criminal case, both the prosecution and the court can play significant roles in achieving a proper balance between a defendant's right to choose counsel and the fair administration of justice. We next examine these respective roles.

### a. *Role of the Prosecution*

Defendants have a right to counsel of their choice, but they also have the right to effective assistance of counsel, *see Strickland v. Washington*, 466 U.S. 668, 686 (1984), and the "correlative right to representation that is free from conflicts of interest," *Wood v. Georgia*, 450 U.S. 261, 271 (1981). Thus, we have "observe[d] that when the government is aware of a conflict of interest, *it has a duty* to bring it to the court's attention and, if warranted, move for disqualification" of the defendant's counsel. *United States v. Migliaccio*, 34 F.3d 1517, 1528 (10th Cir. 1994) (emphasis added); *see also United States v. Tatum*, 943 F.2d 370, 379-80 (4th Cir. 1991).

The prosecution's duty to alert the court to defense counsel's potential and actual conflicts of interest is rooted not only in the defendant's right to effective and conflict-free representation, but also in the prosecutor's role as "an administrator of justice, an advocate, and an officer of the court." ABA Standards for Criminal Justice 3-1.2(b) (3d ed. 1993). As the Supreme Court has explained, "[t]he United States Attorney is the representative . . . of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also* ABA Standards for Criminal Justice 3-

-14-

1.2(c) ("The duty of the prosecutor is to seek justice, not merely to convict.").

The prosecution's duty to disclose defense counsel's potential or actual conflicts of interest facilitates the administration of justice by helping to avoid lengthy delays or retrials that could occur when conflicts render defense counsel's representation ineffective. *See United States v. Malpiedi*, 62 F.3d 465, 470 & n.3 (2d Cir. 1995); *Mannhalt v. Reed*, 847 F.2d 576, 583-84 (9th Cir. 1988); *United States v. Iorizzo*, 786 F.2d 52, 54, 59 (2d Cir. 1986). If the prosecution were to withhold known potential or actual conflicts of interest in the defense's representation, it could gain an unfair tactical advantage by restricting defense counsel's effectiveness at trial. *See Malpiedi*, 62 F.3d at 470 n.3. A few federal appellate courts have reversed convictions based on defense counsel's conflicts at trial and chastised the prosecution for knowing about the potential conflicts and not moving for disqualification. *See id.*; *Mannhalt*, 847 F.2d at 583-84; *Iorizzo*, 786 F.2d at 54, 59; *see also United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994) (noting that the government failed to apprise a reassigned judge of conflict issues and permitted him "to walk unwittingly into the 'mine field'").

Although the prosecution can serve the cause of justice by acting to prevent defense counsel conflicts, we acknowledge the potential for prosecutors to wrongly interfere with a defendant's Sixth Amendment rights. In *United States v. Nichols*, we recognized that prosecutors possess tools—such as forfeiture claims and subpoenas—that could be used to deprive a defendant of the right to choice of counsel. 841 F.2d at 1508. The prosecution could "exclude an especially skilled defense attorney by threatening to

-15-

bring a forfeiture count that it would not include if the defendant agreed to select a less qualified attorney." *Id.* A forfeiture claim could "include everything a defendant owns, thus making it impossible for a defendant to retain an attorney and therefore necessary to rely on appointed counsel." *Id.* Or the prosecution could "request[] a grand jury subpoena that would require the attorney to testify about the attorney-client relationship." *Id.* We noted that "[a]ny of these results would undermine the balance necessary to the adversary system" and would be unacceptable as a form of prosecutorial misconduct. *Id.*

The Supreme Court has recognized another concern:  the possibility that prosecutors may "seek to 'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel at his side." *Wheat*, 486 U.S. at 163.[4] The Court has left that determination primarily to trial courts, who "are undoubtedly aware of this possibility, and must take it into consideration along with all of the other factors which inform" whether to allow defense counsel to proceed. *Id.* We therefore turn to the role of the court.

### b.  *Role of the Court*

While the prosecution has a duty to inform courts of defense counsel's potential and actual conflicts of interest, courts have the duty to "balance a defendant's

---

[4] For example, "the prosecutor might initiate a criminal investigation of defense counsel, not because she believes that there are genuine questions concerning the lawfulness of the attorney's conduct, but out of a motivation to create a conflict between the defense attorney's duty to his client and his personal interest."  Bruce A. Green, *Her Brother's Keeper: The Prosecutor's Responsibility When Defense Counsel Has a Potential Conflict of Interest*, 16 Am. J. Crim. L. 323, 354 (1989).

constitutional right to retain counsel of his choice against the need to maintain the highest standards of professional responsibility, the public's confidence in the integrity of the judicial process and the orderly administration of justice." *Collins*, 920 F.2d at 626 (quotations omitted). Courts may deprive a defendant of his counsel of choice "only where such drastic action is necessary to further some overriding social or ethical interest." *Id.* (quotations omitted). Thus, "as long as its action is not arbitrary, a court may restrict a defendant's choice of counsel if allowing representation by a particular attorney would adversely affect an important public interest." *Nichols*, 841 F.2d at 1504.

An important aspect of the public interest lies "in assuring the ethical conduct of the bar." *Id.* at 1503. "Federal [c]ourts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160. A court may, for example, refuse representation by counsel "not admitted to practice law in the relevant jurisdiction." *Nichols*, 841 F.2d at 1502-03; *see also Wheat*, 486 U.S. at 159 ("Regardless of his persuasive powers, an advocate who is not a member of the bar may not represent clients (other than himself) in court.").

More importantly, "[w]hen a district court finds that counsel has a conflict of interest, real or potential, it retains substantial latitude to disqualify counsel." *Collins*, 920 F.2d at 627 (quotations omitted); *see also Nichols*, 841 F.2d at 1503. "If there is a conflict of interest between the attorney chosen by the defendant and someone involved in the trial, the attorney usually may be excluded unless the likelihood and severity of the

-17-

conflict are minimal compared to the defendant's interest in obtaining counsel of choice." *Nichols*, 841 F.2d at 1503. For example, courts may disqualify counsel who has "been implicated in the [underlying] crime," *id.*, or who is "scheduled to be called as a witness" in the defendant's trial, *id.*

### 2. *Mr. McKeighan's Right to Counsel of Choice*

Mr. McKeighan argues that the Government and the district court deprived him of his right to counsel of choice under the Sixth Amendment to the U.S. Constitution. Accordingly, we address the conduct of the Government and the district court to determine whether their actions were consistent with the principles discussed above.

Because Mr. McKeighan first raised this issue in his post-trial motions requesting a new trial, we review the district court's ruling denying his motions for abuse of discretion. *See United States v. Custodio*, 141 F.3d 965, 966 (10th Cir. 1998); *see also Wheat*, 486 U.S. at 164 ("The evaluation of the facts and circumstances [regarding a defendant's right to counsel] must be left primarily to the informed judgment of the trial court.").

### a. *The Government's Conduct*

Mr. McKeighan contends that the Government violated his right to counsel of choice by forcing Attorney Salazar to withdraw from the case. Specifically, Mr. McKeighan points to the subpoenas of Attorney Salazar's fee information and the Government's sealed ex parte filing regarding potential conflicts of interest. Because the Government provided a sealed ex parte filing to the court, Mr. McKeighan argues,

-18-

Attorney Salazar could not adequately dispute the Government's position regarding any potential conflicts of interest. Moreover, Mr. McKeighan contends that the Government's concern about potential conflicts was unfounded because he was acquitted of money laundering in connection with Attorney Salazar's fee.

Although we recognize the potential for the prosecution to abuse its powers or to create conflicts of interest to deny a defendant the right to counsel of choice, the Government did not do so in this case. The Government fulfilled its duty to notify the district court of potential conflicts of interest in Attorney Salazar's representation and to protect the case against conflicts of interest. *See Migliaccio*, 34 F.3d at 1528.

First, Mr. McKeighan has failed to show the Government acted in bad faith or attempted to manufacture a conflict of interest. *See United States v. Cruz-Alcala*, 338 F.3d 1194, 1197 (10th Cir. 2003) ("Once the prosecution establishes the existence of a conviction, the *defendant* must prove by a preponderance of the evidence that the conviction was constitutionally infirm." (quotations omitted)); *see also United States v. Alvarez*, 137 F.3d 1249, 1252 (10th Cir. 1998) (placing the burden on the defendant to show that his counsel had a conflict of interest and provided ineffective assistance).

Even if the Government's conduct was a cause of Attorney Salazar's withdrawal, it does not follow that a constitutional violation necessarily occurred. As discussed above, considerations of the fair administration of justice may take precedence over a defendant's right to counsel of choice. Only improper or "erroneous" deprivations of a defendant's counsel of choice violate the Sixth Amendment. *See Gonzalez-Lopez*, 548

U.S. at 146. Where a defendant argues that the prosecution is responsible for a deprivation of his counsel of choice, the prosecution's actions must be improper to create an "erroneous" deprivation. *See Nichols*, 841 F.2d at 1508 (noting that "prosecutorial misconduct" could potentially violate a defendant's Sixth Amendment right to counsel of choice).

Here, Mr. McKeighan has failed to show that the prosecution acted improperly when it subpoenaed Attorney Salazar's fee information and suggested potential conflicts of interest to the district court. He has not shown that the Government's concern with Attorney Salazar's representation was manufactured. In fact, the record shows the Government acted in good faith, that its concerns were authentic, and that it took legitimate steps to resolve those concerns.

After his arrest, Mr. McKeighan indicated he had no money other than the cash seized from his storage unit. He then retained Attorney Salazar for a $25,000 fee. Mr. McKeighan's longtime girlfriend, Ms. Bledsoe, obtained this money in cash bound in rubber bands from Mr. McKeighan's friend. She had rarely seen this friend and knew him only as "Charlie." Ms. Bledsoe then gave the cash to Attorney Salazar in three installments without obtaining receipts and later testified that she thought the payment of Mr. McKeighan's fee was suspicious. These facts support the Government's concerns about potential conflicts of interest and negate Mr. McKeighan's allegations that it acted

improperly.[5]

Second, Mr. McKeighan's judgment of acquittal on the money laundering count does not show, as he argues, that he was wrongfully deprived of his counsel of choice. Nor does it mean there was no potential conflict in Attorney Salazar's representation or that the Government acted improperly. At the time of the Government's ex parte submission, "[t]he likelihood and dimensions of nascent conflicts of interest [were] notoriously hard to predict, even for those thoroughly familiar with criminal trials." *Wheat*, 486 U.S. at 162-63. Mr. McKeighan has not shown that the Government brought the superseding indictment in bad faith, and hindsight does not show the lack of genuine concern about potential conflicts.

Third, although Mr. McKeighan argues that the Government's ex parte submission deprived Attorney Salazar of the opportunity to challenge the Government's assertion of potential conflicts, Attorney Salazar did not object at the August 21, 2006 hearing when the court permitted the Government to make the ex parte submission.

Finally, and perhaps most important, we cannot conclude from this record that the Government forced Attorney Salazar to withdraw, especially when we examine Attorney

---

[5] The district court also noted that this was the first time in its recollection that it had "seen this U.S. Attorney's Office go after a lawyer's fee . . . [s]o it's not as if that's their standard practice; it's not as if they just like to hassle the lawyers as a tactic." ROA, Vol. 2, Pt. 2, Doc. 341 at 29. Thus, the record does not indicate that the prosecution had a history of seeking forfeiture and information about defense attorneys' fees, which might otherwise have supported Mr. McKeighan's claim that it abused its subpoena and forfeiture powers.

Morgan's stated reasons to withdraw as local counsel. We agree with the Government that the direct cause of Attorney Salazar's withdrawal was Attorney Morgan's independent decision to withdraw. Without local counsel, the Government argues, Attorney Salazar was unable to continue his representation of Mr. McKeighan. In response, Mr. McKeighan argues that the Government improperly pressured Attorney Morgan to leave the case, so it was that same Government pressure that ultimately precipitated Attorney Salazar's withdrawal.

Attorney Morgan's motion to withdraw undercuts Mr. McKeighan's position. She stated in her motion that she "request[ed] leave to withdraw because *a conflict of interest has arisen in the case*." ROA, Vol. 1, Doc. 33, at 1 (emphasis added). Attorney Morgan mentioned the Government's ex parte filing and issues "concerning the legal fees paid to [Attorney] Salazar and to [her]." *Id.* at 1-2. She then cited and discussed Rule 1.7(b) of the Kansas Rules of Professional Conduct, which at the time stated that "[a] lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests." *See In re Swisher*, 179 P.3d 412, 419 (Kan. 2008) (quotations omitted). Attorney Morgan admitted that this rule was "directly applicable" to her representation of Mr. McKeighan and that, accordingly, she was "compelled to file [her] motion to withdraw." ROA, Vol. 1, Doc. 33, at 2.

Although Attorney Salazar may have believed that he had no potential conflicts of interest in representing Mr. McKeighan, Attorney Morgan's motion to withdraw indicates

-22-

she did not feel the same about her representation. She acknowledged that she had a conflict of interest in representing Mr. McKeighan and stated that Rule 1.7(b) required her withdrawal. We conclude that Attorney Morgan's withdrawal—based on an acknowledged conflict of interest, not improper Government conduct—precipitated Attorney Salazar's withdrawal.

"We do not assume the government will abuse its discretion" and improperly interfere with a defendant's choice of counsel. *Nichols*, 841 F.2d at 1508. Here, the record does not show that the Government abused its powers to deprive Mr. McKeighan of his Sixth Amendment right to counsel of choice.

### b. *The District Court's Conduct*

Mr. McKeighan also asserts that the district court violated his right to counsel of choice by forcing Attorney Salazar to withdraw.

Mr. McKeighan faults the district court for "advising both counsel and [him] at the September 11, 2006 hearing that they *most likely had a conflict of interest* given the Government's ex parte and untested allegations." Aplt. Br. at 36 (emphasis added). In his view, the court erred in relying on the Government's ex parte submission without conducting an adversarial hearing to determine whether Attorney Salazar had potential conflicts of interest. According to Mr. McKeighan, the district court also ordered Attorney Salazar to deposit his fee into the court's registry and thus "deprived [Mr. McKeighan] of money for retaining an attorney without knowing the grounds and facts supporting the seizure of funds." *Id.* at 31. For the following reasons, we conclude that

-23-

the record does not support Mr. McKeighan's characterization of the district court's conduct.

First, the district court did not state that Attorney Salazar "most likely had a conflict of interest," *id.* at 36. Nor did it rely on the Government's ex parte submission to reach any conclusion regarding Attorney Salazar's representation. The court stated that it was only giving examples of potential conflicts of interest, that it was not accusing Attorney Salazar of any wrongdoing, and that it was "not picking sides in all this" or "throwing in with the [G]overnment against [Attorney Salazar]." ROA, Vol. 2, Pt. 2, Doc. 341, at 31. The court also told Mr. McKeighan that it was "not suggesting any course of action to [him]" and was "merely attempting to make sure [he understood] the circumstances so that [he could] make a knowing and intelligent decision" about retaining Attorney Salazar. *Id.* at 20.

Second, the district court was open to holding a hearing on the Government's discovery motion and ex parte submission, but Attorney Morgan's and Attorney Salazar's withdrawals mooted the need for a hearing. At the August 21, 2006 hearing, the district court permitted the Government to provide a sealed ex parte submission and scheduled a hearing for September 11, 2006. The court stated that when it received the ex parte submission, it would let the parties know "whether we're going to conduct some kind of a hearing to look into conflict issues." ROA, Vol. 2, Pt. 2, Doc. 340, at 7. The court informed Attorney Salazar that it did not know what the Government's submission would include and that the court may be "persuaded . . . to have a hearing to say whether or not

there's a conflict." *Id.* at 9.

But the day before the Government made its ex parte submission, Attorney Morgan moved to withdraw. At the September 11, 2006 hearing, the court granted Attorney Morgan's motion. It then informed Attorney Salazar that because he lacked local counsel to support his *pro hac vice* admission, the court would not proceed to address the Government's motion to withhold discovery and its supporting ex parte submission. Unable to secure local counsel, Attorney Salazar moved about two weeks later to withdraw.

The district court did not deny Mr. McKeighan and Attorney Salazar an adversarial hearing on the Government's accusations of potential conflicts. The district court was open to holding a hearing, but Attorney Salazar was unable to secure local counsel and withdrew before a hearing could be held. The court's insistence on the participation of counsel licensed to practice in Kansas did not violate Mr. McKeighan's right to counsel of choice. *See Nichols*, 841 F.2d at 1502-03.

Third, the record gives no indication that the court was planning to disqualify Attorney Salazar. The court explained to Mr. McKeighan the conflicts of interest that could arise were he to continue with Attorney Salazar as his counsel. It told Mr. McKeighan that if Attorney Salazar obtained local counsel and if Mr. McKeighan "wanted to stick with Mr. Salazar, [the court] would be fairly inclined to say . . . we can move forward [and the court could] give [Mr. McKeighan] the conflict-of-interest-waiver colloquy." ROA, Vol. 2, Pt. 2, Doc. 341, at 28. If Mr. McKeighan were to waive any

potential conflicts of interest, the court stated it "would be delighted to have [Attorney Salazar] as a lawyer in this case." *Id.* at 34.

Thus, the record does not support Mr. McKeighan's assertion that the district court pressured Attorney Salazar to withdraw. Had Attorney Salazar been able to obtain local counsel, the court would have allowed Mr. McKeighan to waive any possible conflicts of interest and to continue with Attorney Salazar as his counsel.

Finally, although the district court ordered Attorney Salazar to place his fee in the court's registry, that order resulted from his suggestion and request. Fearing questions from his bank and the Texas bar if his trust account were subject to a grand jury subpoena, Attorney Salazar suggested that the court order the placement of the fee into the court's registry. Attorney Salazar stated that he was "putting [the fee] in the registry of funds *voluntarily*, not per the [grand jury] subpoena." *Id.* at 46 (emphasis added). We cannot fault the district court for acting on Attorney Salazar's suggestion.[6]

_____

[6] Although his argument is unclear, Mr. McKeighan seems to suggest that the order to place the fee in the court's registry was contrary to our decision in *United States v. Jones*, 160 F.3d 641 (10th Cir. 1998). In *Jones*, we addressed whether a pre-trial adversarial hearing must be held after the government seizes a defendant's assets. *Id.* at 645. To be entitled to such a hearing, a defendant must (1) request one with a properly supported motion, (2) demonstrate that he has no other assets with which to retain an attorney and to pay living expenses, and (3) make a prima facie showing that the grand jury erred in determining that the assets should be seized. *Id.* at 647. "Once a defendant satisfies these initial burdens, due process requires a district court to conduct an adversarial hearing at which the government must establish probable cause to believe that the restrained assets are traceable to the underlying offense." *Id.*

    *Jones* is not on point here. First, Attorney Salazar suggested and requested to place his fee in the court's registry. There is no risk of an erroneous deprivation of

Continued . . .

Because, whenever possible, defense counsel should be made aware of potential conflicts of interest and be given the chance to dispel concern, the district court's allowance of the Government's sealed ex parte submission about Attorney Salazar's potential conflicts of interest gives us some pause. But the district court was prepared to hold an adversarial hearing on the issues raised by the ex parte submission, and, for the reasons discussed above, we cannot conclude that the court improperly pressured Attorney Salazar to withdraw and thus erroneously deprived Mr. McKeighan of his counsel of choice.[7]

* * *

In sum, the record does not support Mr. McKeighan's assertion that the

_____

Cont.

property, and thus no due process concern, when a party requests that his property be restrained. Second, Attorney Salazar never filed a motion for an adversarial hearing, and the grand jury had yet to issue the superseding indictment and forfeiture allegation. The court's order and the lack of an adversarial hearing therefore do not offend our analysis in *Jones.*

[7] Mr. McKeighan argues that the district court's failure to hold an adversarial hearing and its reliance on the Government's ex parte submission violated his right to due process under the Fifth Amendment. According to Mr. McKeighan, the alleged due process violation resulted in the violation of his Sixth Amendment right to counsel.

We reject Mr. McKeighan's due process argument for the same reasons we reject his claim under the Sixth Amendment. Attorney Salazar and Mr. McKeighan were not denied the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). The record indicates the court was open to holding a hearing on Attorney Salazar's potential conflicts of interest, but Attorney Salazar was unable to obtain local counsel and withdrew.

Government and the district court acted improperly to force Attorney Salazar to withdraw. The district court did not abuse its discretion when it denied Mr. McKeighan's post-trial motions asserting a violation of his Sixth Amendment right to counsel of choice.

## B. *Allegations of Sleeping Jurors*

Mr. McKeighan contends that the district court failed to investigate whether jurors were sleeping during his trial. In his view, this failure violated his right to an impartial jury under the Sixth Amendment.

### 1. *Standard of Review*

The parties disagree on the appropriate standard of review for this issue. Mr. McKeighan argues that our review is for abuse of discretion. He identified the sleeping-juror issue in a motion for a new trial, and we ordinarily review the denial of such motions for abuse of discretion. *See United States v. Foy*, 641 F.3d 455, 468 (10th Cir. 2011), *cert. denied*, 132 S. Ct. 467 (2011). The Government argues that the plain-error standard applies because Mr. McKeighan did not contemporaneously object to the district court's alleged failure to investigate whether jurors were sleeping.

We need not decide which standard of review is appropriate because Mr. McKeighan's claim cannot succeed under either standard.

### 2. *Right to an Impartial Jury*

Criminal defendants have a constitutional right to a fair trial and an impartial jury, *see Irvin v. Dowd*, 366 U.S. 717, 721 (1961), that is competent and unimpaired, *see*

*Tanner v. United States*, 483 U.S. 107, 126-27 (1987). A defendant could be deprived of the Fifth Amendment right to due process or the Sixth Amendment right to an impartial jury if jurors fall asleep and are unable to fairly consider the defendant's case. *See United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000); *United States v. Springfield*, 829 F.2d 860, 864 (9th Cir. 1987).

"However, a court is not invariably required to remove sleeping jurors, and a court has considerable discretion in deciding how to handle a sleeping juror." *Freitag*, 230 F.3d at 1023 (citations omitted). As a general rule, juror misconduct, such as inattentiveness or sleeping, does not warrant a new trial absent a showing of prejudice—i.e., that the defendant did not receive a fair trial. *See United States v. Lawrence*, 405 F.3d 888, 903 (10th Cir. 2005); *see also United States v. Fernández-Hernández*, 652 F.3d 56, 75 (1st Cir. 2011) ("A sleeping juror does not violate a defendant's due process rights unless the defendant can show he was prejudiced to the extent that he did not receive a fair trial."), *cert. denied*, 132 S. Ct. 353 (2011); *Springfield*, 829 F.2d at 864 (referring to sleeping as "juror misconduct" and requiring a demonstration that the defendant was "deprived . . . of his right to an impartial jury and, more generally, to a fair trial").

To determine prejudice, courts may consider whether "the sleeping juror missed large portions of the trial or [whether] the portions missed were particularly critical." *Freitag*, 230 F.3d at 1023; *see also United States v. Barrett*, 703 F.2d 1076, 1083 n.13 (9th Cir. 1983). Courts also may review the record to determine whether the district court was made aware of sleeping jurors, whether the court took action, and whether the

record establishes that jurors were actually sleeping. *See United States v. Carter*, 433 F.2d 874, 876 (10th Cir. 1970) (explaining that there was "no basis for setting aside the finding of the trial judge," who stated, "I watched her (the juror in question) very closely, . . . and I am convinced she was not asleep"); *see also Freitag*, 230 F.3d at 1024 ("We find no abuse of discretion by the district judge, especially since she had not noticed an extensive sleeping problem and she admonished counsel on both sides to alert her to any further sleeping episodes."); *United States v. McFerren*, 142 F.3d 437, at *6 (6th Cir. 1998) (unpublished) ("At the trial level it does appear that a couple of the jurors had trouble staying awake at certain times. However, it seems from the trial transcript that both the attorneys and the judge kept a watchful eye on the jury.").

A defendant's general assertions that jurors dozed off during parts of a trial "are too vague to establish prejudice." *United States v. Tierney*, 947 F.2d 854, 869 (8th Cir. 1991); *see also United States v. Sherrill*, 388 F.3d 535, 537 (6th Cir. 2004) ("Sherrill has provided no evidence—indeed, he makes only a vague assertion—that the juror was in fact sleeping, and that such behavior had a prejudicial effect on his defense."); *United States v. Swapp*, 934 F.2d 326, at *7 (10th Cir. 1990) (unpublished) ("Something more than unverified conjecture is necessary to justify the grant of a new trial on the basis of juror misconduct where only potentially suspicious circumstances are shown . . . .").

### 3. *No Error*

At Mr. McKeighan's trial, the defense and prosecution notified the district court a number of times that jurors were nodding off or shutting their eyes.[8] But the trial transcript does not establish that jurors were actually asleep. After Mr. McKeighan's counsel notified the court that a juror was "nodding in and out," the district court kept "an eye on her" and determined that "part of the time she was quite alert because she was taking notes," although "she may have . . . diverted from that a little bit." ROA, Vol. 2, Doc. 336, at 304. After other allegations of juror inattentiveness, the district court stated it had "looked over [at a juror] frequently and [had] never seen her in the mode of sleeping," ROA, Vol. 2, Pt. 2, Doc. 337, at 71, and that "[e]very time a juror closes their eyes, we can't presume they are sleeping." *id.* at 142.

In addition, when the district court asked whether Mr. McKeighan claimed prejudice due to a juror's alleged inattentiveness, his counsel stated, "[N]ot at this time, your Honor." ROA, Vol. 2, Doc. 336, at 305. Mr. McKeighan's counsel did not assert prejudice during the remainder of trial; nor did Mr. McKeighan ask the court to

---

[8] *See* ROA, Vol. 2, Doc. 336, at 295 (Defense counsel: "We have a juror who is nodding in and out."); *id.* at 305 (Defense counsel: "I believe it was noticed by everyone at the defense table that from time to time [the juror] would drift out, become startled because she had drifted asleep, and wake back up."); ROA, Vol. 2, Pt. 2, Doc. 337, at 52 (Prosecution: "Detective Johnson just mentioned that the same juror appears to be sleeping again. . . . I looked over, and her eyes were shut." Court: "We will ask them to stand up here or something."); *id.* at 71 (Prosecution: "The times I've looked at her she has had her eyes closed." ); *id.* at 142-43 (Defense counsel: "We have a new sleeper. . . . The only thing that causes me concern . . . is they open and close, but if you watch them constantly, there's a head bop.").

investigate whether jurors were sleeping or request the substitution of alternate jurors. *See United States v. Holder*, 652 F.2d 449, 451 (5th Cir. Unit B Aug. 1981) ("Furthermore, Holder's counsel did not request replacement of that juror by an alternate. Holder has not shown that he was prejudiced by the court's action.").

In sum, Mr. McKeighan did not assert prejudice during trial and at one point disclaimed prejudice. He has not identified the portions of trial during which jurors allegedly slept or established that these portions were critical. Nor does the record establish that jurors actually slept during Mr. McKeighan's trial. His allegations are too vague to establish prejudice, and we cannot conclude he was denied his right to an impartial jury. The district court did not abuse its discretion or commit plain error.

## C. *Obstruction of Justice*

Mr. McKeighan contends that the district court improperly applied a two-level sentencing enhancement for obstruction of justice under Section 3C1.1 of the U.S. Sentencing Guidelines (the "Guidelines").

"In reviewing the district court's application of the sentencing guidelines, this court reviews legal questions de novo and reviews factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Maestas*, 642 F.3d 1315, 1319 (10th Cir. 2011) (quotations omitted). A district court's determination that a defendant obstructed justice is a factual finding that we review for clear error. *See United States v. Gillespie*, 452 F.3d 1183, 1189 (10th Cir. 2006). A district court commits clear error if its finding is "without factual support in the

-32-

record or if the appellate court, after reviewing all of the evidence, is left with a definite and firm conviction that a mistake has been made." *Maestas*, 642 F.3d at 1319 (quotations omitted).

The Guidelines' two-level enhancement for obstruction of justice applies when a "defendant willfully obstructed or impeded, *or attempted to obstruct or impede*, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1(1) (emphasis added). The defendant's obstructive conduct must relate to either "the defendant's offense of conviction and any relevant conduct" or "a closely related offense." *Id.* § 3C1.1(2)(A), (B).

The commentary to Section 3C1.1 includes examples of obstructive conduct, including "threatening, intimidating, or otherwise *unlawfully influencing a . . . witness*, . . . directly or indirectly, or *attempting to do so*." *Id.* cmt. n.4(A) (emphases added). Thus, under Section 3C1.1, "a defendant need not actually threaten [a] witness; he need only attempt to influence the witness." *United States v. Fleming*, 667 F.3d 1098, 1109 (10th Cir. 2011) (quotations omitted). Attempted obstruction of justice occurs when the defendant "(1) intended to obstruct justice, and (2) committed an act that constitutes a substantial step toward the obstruction of justice." *Id.* at 1107.

At trial, Ms. Bledsoe and Mr. Orr testified about a meeting after Mr. McKeighan's arrest. During the meeting, Mr. Orr spoke with Mr. McKeighan over the phone. Mr. Orr testified that Mr. McKeighan wanted Mr. Orr to say that the majority of the items in the

storage unit belonged to his girlfriend, which Mr. Orr testified was untrue. Ms. Bledsoe and Mr. Orr testified that Mr. Orr signed a note stating that his girlfriend stored marijuana and firearms at the storage unit. However, Ms. Bledsoe and Mr. Orr differed regarding who drafted the note.

At sentencing, the district court stated it was "persuaded from the testimony of Mr. Orr and that of Ms. Bledsoe that the . . . genesis for this note was Mr. McKeighan's attempt to get his friends to shift the blame to someone else for the items that were found in the storage unit and which ultimately led to the charges in this case." ROA, Vol. 2, Pt. 2, Doc. 342, at 14-15. The court therefore applied Section 3C1.1's two-level enhancement.

On appeal, Mr. McKeighan offers three reasons why the district court erred in applying the obstruction of justice enhancement. First, he argues that because Ms. Bledsoe's and Mr. Orr's testimony conflicted over who drafted the note, "it should not be relied upon to enhance [his] sentence." Aplt. Br. at 43. Second, Mr. McKeighan contends that because he did not use the note at trial, he did not hinder or impede the investigation of his case. Finally, Mr. McKeighan argues he was not charged with or convicted of obstruction of justice and did not commit perjury. We reject Mr. McKeighan's arguments.

First, although their testimony conflicted over who drafted the note, Mr. Orr and Ms. Bledsoe both testified that Mr. Orr signed the note. The record supports the district court's conclusion that Mr. McKeighan instigated preparation of the note and intended to

use it to shift blame to Mr. Orr's girlfriend. Mr. Orr testified that Mr. McKeighan attempted to get Mr. Orr to say the majority of the items in the storage unit belonged to Mr. Orr's girlfriend, which was untrue.[9] Thus, there was evidence that Mr. McKeighan intended to influence Mr. Orr to lie about the involvement of Mr. Orr's girlfriend in the crime and that he asked Mr. Orr to sign a note to that effect. This evidence demonstrates that Mr. McKeighan intended to obstruct justice and that he committed a substantial step toward doing so. *Cf. United States v. Washington*, 653 F.3d 1251, 1264 (10th Cir. 2011), *cert. denied*, 132 S. Ct. 1039 (2012).

Second, it is not relevant to Section 3C1.1 that Mr. McKeighan did not introduce the note at trial. The enhancement requires only an "attempt[] to obstruct," which may occur during "investigation, prosecution, or sentencing." U.S.S.G. § 3C1.1(1). Further, as discussed above, the attempt requires only intent and a substantial step—Mr. McKeighan's effort to influence Mr. Orr to falsely claim and sign a note stating that the majority of the storage unit items belonged to his girlfriend.

Finally, Section 3C1.1 does not require that Mr. McKeighan be charged with or convicted of obstruction of justice or perjury. The enhancement applies when a defendant obstructs or attempts to obstruct "the administration of justice with respect to the investigation, prosecution, or sentencing *of the instant offense of conviction*," *id.*

---

[9] Mr. McKeighan acknowledges that he "did speak to Mr. Orr on the phone about the note" but argues "there is no showing that [Mr.] Orr was coerced into writing or signing the note." Aplt. Br. at 43. Section 3C1.1 does not require coercion, however. Attempting to unlawfully influence a witness is sufficient. *See* U.S.S.G. § 3C1.1.

(emphasis added), and that the obstructive conduct relate to the "*offense of conviction* and any relevant conduct," *id.* § 3C1.1(2)(A) (emphasis added). The enhancement requires only that the obstructive conduct relate to the defendant's underlying offense, not that the obstructive conduct form the basis of the indictment and the offense of conviction.

Accordingly, the district court did not clearly err in finding that Mr. McKeighan obstructed justice and in applying Section 3C1.1's two-level enhancement.

### III.   CONCLUSION

For the foregoing reasons, we affirm Mr. McKeighan's conviction and sentence.