# United States Court of Appeals
## For the First Circuit

No. 21-1574

UNITED STATES OF AMERICA,

Appellee,

v.

GLENN A. CHIN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Howard, Circuit Judges.

James L. Sultan, with whom Rankin & Sultan was on brief, for
appellant.
Christopher R. Looney, Assistant United States Attorney, with
whom Rachael S. Rollins, United States Attorney, was on brief, for
appellee.

July 15, 2022

**BARRON, Chief Judge**.  This appeal requires us to revisit the sentence that Glenn Chin, a former supervising pharmacist at the New England Compounding Center ("NECC"), received for his convictions in connection with the criminal investigation into the deadly nationwide outbreak of fungal meningitis in 2012 that was traced to the company's shipments of contaminated drugs.  When we last considered Chin's sentence, we vacated and remanded it.  See United States v. Chin, 965 F.3d 41, 60 (1st Cir. 2020) ("Chin I").  The United States District Court for the District of Massachusetts resentenced Chin while applying two sentencing enhancements under the United States Sentencing Guidelines ("Guidelines").  U.S. Sent'g Guidelines Manual §§ 2B1.1(b)(16)(A), 3A1.1(b)(1) [hereinafter U.S.S.G].  Chin contends that neither enhancement applies and thus that his sentence must be vacated once again.  We affirm.

## I.

The events at NECC have already been the subject of several reported decisions by this Court.  We thus will rehearse only the facts relevant to Chin's current challenge to certain aspects of his resentencing.  We refer the reader to Chin's first appeal, Chin I, 965 F.3d at 45-46, and to the appeal of Barry Cadden, Chin's boss at NECC, United States v. Cadden, 965 F.3d 1, 7-8 (1st Cir. 2020), for a more detailed discussion of the underlying facts.

NECC was a pharmacy based in Framingham, Massachusetts, that specialized in high-risk drug compounding, which refers to a process in which non-sterile ingredients are combined to create sterile drugs that are prepared at the request of hospitals and other healthcare providers.  Chin worked as a licensed pharmacist at NECC from April 2004 to October 2012.

In January 2010, Chin was promoted to the role of supervising pharmacist at NECC, in which he oversaw all drug production in NECC's two "clean rooms."  In the fall of 2012, a number of patients who had received epidural injections of methylprednisolone acetate ("MPA") -- a steroid for pain relief -- contracted rare fungal infections that were ultimately traced back to contaminated drugs produced at NECC under Chin's supervision.  A number of those patients died.

A federal criminal investigation into NECC's practices ensued, and in connection with it Chin was charged in December of 2014 with "racketeering in violation of 18 U.S.C. § 1962(c); racketeering conspiracy in violation of 18 U.S.C. § 1962(d); forty-three counts of federal mail fraud in violation of 18 U.S.C. § 1341; and thirty-two counts of violating the Federal Food, Drug, and Cosmetic Act ('FDCA'), see 21 U.S.C. §§ 331(a), 333(a)." Chin I, 965 F.3d at 45.  After a jury trial, Chin was found guilty on all counts.  Id. at 46.

Evidence was introduced at trial that showed that Chin was familiar with Chapter 797 of the United States Pharmacopeia ("USP-797"), which sets forth standards governing sterile compounding that pharmacists licensed in Massachusetts must follow.  Evidence introduced at trial also supportably showed that, despite NECC claiming to be USP-797 compliant, Chin knew that NECC was selling MPA that had not been properly sterilized or tested for sterility in accordance with USP-797.  And, evidence was introduced at trial that showed that NECC's clean room became grossly contaminated with mold and bacteria after Chin instructed clean room staff to ignore cleaning protocols, and that Chin knew of this contamination.

At Chin's sentencing in January 2018, the government, among other things, requested that the District Court apply the two Guidelines that set forth the enhancements that are the subject of Chin's present appeal.  The first enhancement is U.S.S.G. § 2B1.1(b)(16)(A), which imposes a two-level increase in the base offense level of those convicted of certain crimes "[i]f the offense involved . . . the conscious or reckless risk of death or serious bodily injury."  The second enhancement is U.S.S.G. § 3A1.1(b), which imposes a two-level increase in the base offense level "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim" and an additional two-

level increase if that enhancement applies and "the offense involved a large number of vulnerable victims."

The District Court declined to apply either enhancement in sentencing Chin to a term of imprisonment of 96 months, to be followed by two years of supervised release. The District Court determined at Chin's first sentencing that the "conscious or reckless risk" enhancement did not apply because "the evidence did not establish a reckless and knowing disregard of a reasonable certainty of causing death or great bodily harm." The District Court determined that the "vulnerable victim" enhancement did not apply because "here the victims that were identified were the clinics and the hospitals who purchased the drugs," and "because we construe 'victim' differently for purposes of sentencing, the enhancements do not apply on a proximate cause theory to persons who were not recipients of NECC's representations" -- that is, the individuals who were ultimately harmed by injections of tainted pharmaceuticals from NECC.

The government appealed the sentence that the District Court had imposed. It did so, in part, on the ground that the District Court erred in not applying either enhancement.

On appeal, this Court rejected the District Court's basis for determining that the "conscious or reckless risk" enhancement did not apply. Chin I, 965 F.3d at 53. We first explained that the District Court failed to consider whether Chin's

- 5 -

"relevant conduct," rather than the nature of his "offense" alone, carried with it the risk of death or serious bodily injury. Id. at 52–53. We further explained that the District Court erred because it

> found that Chin did not act with a "reckless and knowing" state of mind in disregarding a "reasonable certainty of . . . death or great bodily harm." The sentencing enhancement, however, describes the requisite mental state using disjunctive language: the enhancement applies so long as the defendant acted in spite of either a "conscious or reckless risk." U.S.S.G. § 2B1.1(b)(16)(A) (emphasis added). Thus, the District Court's finding does not foreclose the possibility that Chin's offense involved the mental state necessary for the enhancement's application. We therefore vacate and remand the sentence for the District Court to assess whether any of Chin's relevant conduct, as defined under U.S.S.G. § 1B1.3(a), "involved . . . the conscious or reckless risk of death or serious bodily injury." Id. § 2B1.1(b)(16).

Id. at 53 (omissions in original).

Chin I was published on the same day as Cadden, and it referenced the Cadden opinion in its analysis of the "conscious or reckless risk" issue. See Chin I, 965 F.3d at 52. Cadden similarly vacated the District Court's refusal to apply this enhancement to Cadden and remanded for the court to consider the proper mens rea for the § 2B1.1(b)(16)(A) enhancement. We explained that

> the District Court . . . at no point directly addressed in sentencing whether a

- 6 -

> preponderance of the evidence . . . established that Cadden's relevant conduct associated with the mail fraud involved a "conscious or reckless risk of death or serious bodily injury." U.S.S.G. § 2B1.1(b)(16); Cf. United States v. Lucien, 347 F.3d 45, 56-57 (2d Cir. 2003) (concluding that a conscious risk is one "known to the defendant" while a reckless risk is "the type of risk that is obvious to a reasonable person and for which disregard of said risk represents a gross deviation from what a reasonable person would do").

965 F.3d 1, 34-35.

In Chin I, this Court also rejected the District Court's basis for determining that the "vulnerable victim" enhancement did not apply. We explained in doing so that, "'[t]o come within the guidelines' definition' of 'victim,' 'one need not be a victim of the charged offense so long as one is a victim of the defendant's other relevant conduct.'" 965 F.3d at 54 (alteration in original) (quoting Cadden, 965 F.3d at 35). Moreover, in Chin I, with respect to whether Chin's particular conduct warranted the enhancement, we framed the question on remand with reference to commentary in the Guidelines. Specifically, we stated, "[w]e . . . leave it to the District Court in the first instance to address, among other things, whether [Chin's] actions were analogous to those of a fraudster who 'market[s] an ineffective cancer cure,' who the Guidelines indicate would merit

- 7 -

the enhancement, U.S.S.G. § 3A1.1 cmt. n.2." Chin I, 965 F.3d at 54.

Following this Court's decisions in Cadden and Chin I, Cadden was resentenced on July 7, 2021. Chin was resentenced the next day by the same judge who had resentenced Cadden and who had previously sentenced both men.

At Cadden's resentencing, the District Court observed that, at the first sentencing, it had treated the applicable mens rea standard as "not recklessness in the tort law sense but in the appreciably stricter criminal law sense, requiring actual knowledge of an impending harm easily preventable." But, the District Court noted in resentencing Cadden, "[i]t's clear rather from the decision in Mr. Cadden's case that the First Circuit has adopted the Second Circuit's definition [in Lucien, 347 F.3d at 56-57], which is a quite different definition of recklessness." The District Court then quoted the definition of recklessness from Lucien: "the type of risk that is obvious to a reasonable person and for which disregard of said risk represents a gross deviation from what a reasonable person would do," Lucien, 347 F.3d at 56-57.

In assessing whether the enhancement applied to Cadden, the District Court found that Cadden "preside[d] over" a "high-risk enterprise" at NECC and did so

> despite warnings, signals, . . . incomplete testing, falsification of drug lab cleaning reports, . . . the appearance of mold and other contaminants in the clean room, and his superior knowledge of the risk involved[.] I have to conclude that [Cadden's] conduct did and does fit within the definition of "recklessness."

The District Court then applied the enhancement to Cadden.

Chin was resentenced by the District Court the day after Cadden was. The District Court declared in resentencing Chin, "I do not want to retread ground that I covered yesterday. . . . . I assume [the First Circuit's quotation of Lucien in Cadden] meant they were adopting or at least embracing the Second Circuit's view of how 'recklessness' would be defined in this case." The District Court then held the "conscious or reckless risk" enhancement applicable to Chin.

In addition, at Cadden's resentencing, the District Court noted that, in light of the First Circuit's ruling in Cadden's first appeal, "'victims' [are] defined . . . by the larger picture of [an offender's] conduct as a whole," and that "any person who entrusts medical personnel to inject a foreign substance into their spine by definition fits what I would think, and ordinary people would think, is a definition of being in a vulnerable position." The District Court then applied the "vulnerable victim" enhancement to Cadden.

At Chin's resentencing, the District Court observed that the "First Circuit['s] . . . expansive view of what constitutes a 'victim' under the Guidelines was pretty clear to me," and that "vulnerability can . . . refer to one's . . . inability to protect one's self under the circumstances."  The District Court then held the "vulnerable victim" enhancement applicable to Chin as well.

After applying both the "conscious or reckless risk" and "vulnerable victim" enhancements to Chin, the District Court determined that Chin's total offense level was 34.  Given that the District Court determined that Chin's Criminal History Category was I, the District Court calculated his Guidelines Sentencing Range to be a term of imprisonment of 151–188 months.  The District Court thereafter imposed a 126-month term of imprisonment and two years of supervised release.  Chin timely appeals. "[W]e review the District Court's 'factfinding for clear error and afford de novo consideration to its interpretation and application of the sentencing guidelines.'"  Chin I, 965 F.3d at 50 (quoting United States v. Benítez-Beltrán, 892 F.3d 462, 469 (1st Cir. 2018)).

## II.

We start with Chin's challenge to the District Court's application of the two-level enhancement set forth in U.S.S.G. § 2B1.1(b)(16)(A).  We are not persuaded by it.

- 10 -

## A.

Chin first argues that the District Court erred in interpreting § 2B1.1(b)(16)(A). He contends that is so because the District Court held the enhancement to apply so long as there is proof that the offense, including the defendant's relevant conduct, involved a risk of death or serious bodily injury of which the defendant should have been aware and thus to apply even in the absence of proof by a preponderance of the evidence that the defendant in fact knew of that risk.

Chin contends in support of that argument that the District Court based its "should have known" interpretation of the enhancement solely on our invocation in the course of construing that same provision of the Guidelines in Cadden of the Second Circuit's decision in Lucien. He goes on to contend, however, that "it is not at all clear from this Court's 'Cf.' citation to Lucien that it was adopting that particular definition of 'reckless risk.'"

Chin further argues that, given that we did not hold in Cadden that Lucien controls, we must construe the enhancement afresh. And, he contends, by virtue of the use of the word "reckless" in § 2B1.1(b)(16)(A), the enhancement is properly construed to require proof that a defendant was aware that his relevant conduct in committing his offense created a risk of death or serious bodily injury and not merely that he should have known

- 11 -

of that risk. He then contends that, in consequence, the enhancement cannot be applied to him, because the government did not prove by a preponderance of the evidence that Chin was aware of any such risk in engaging in the conduct relevant to his offense.

We agree with Chin that the "Cf." citation to Lucien in our Cadden decision, 965 F.3d at 34-35, does not resolve how this enhancement must be construed. We did not have occasion in Cadden to address the meaning of the word "reckless" in the enhancement. Our focus there was solely on the District Court's failure to address Cadden's "relevant conduct" in applying the enhancement as § 1B1.1 cmt. n.1(I) of the Guidelines requires, given that the District Court appeared to focus in assessing whether the enhancement applied on the nature of the offenses of which Cadden had been convicted. See Cadden, 965 F.3d at 34; U.S.S.G. § 1B1.1 cmt. n.1(I) (defining "offense"); id. § 1B1.3(a)(1)(A) (setting forth "relevant conduct" for purposes of computing base offense level, offense characteristics, and adjustments). But, even though Cadden's invocation of Lucien is not controlling of the question presented here, we nonetheless conclude that the enhancement is best construed as Lucien construed it.

The Guideline refers to a "conscious or reckless risk." U.S.S.G. § 2B1.1(b)(16)(A) (emphasis added). If we were to read "reckless" in this Guideline itself to require a defendant

to be aware of the risk of death or substantial bodily injury, as Chin contends we must, the use of the words "conscious or" in that same Guideline would be superfluous.  See United States v. DeLuca, 17 F.3d 6, 10 (1st Cir. 1994) ("'[A]ll words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous.'  We think that this principle is fully applicable to the sentencing guidelines . . . ." (internal citations omitted) (quoting Lamore v. Ives, 977 F.2d 713, 716-17 (1st Cir. 1992))).

Nor can this redundancy be avoided, as Chin suggests, by "requiring the government to prove, at the very least, what amounts to willful blindness" to prove recklessness.  "Willful blindness serves as an alternate theory on which the government may prove knowledge."  United States v. Pérez-Meléndez, 599 F.3d 31, 41 (1st Cir. 2010).

In construing the Guideline to require proof only that the risk would have been obvious to a reasonable person in Chin's position, we align ourselves not only with the Second Circuit decision in Lucien, but with the Ninth and Tenth Circuits too. See United States v. Maestas, 642 F.3d 1315, 1321 (10th Cir. 2011) ("[A] defendant's conduct involves a conscious risk if the defendant was subjectively aware that his or her conduct created a risk of serious bodily injury, and a defendant's conduct involves

- 13 -

a reckless risk if the risk of bodily injury would have been obvious to a reasonable person."); United States v. Johansson, 249 F.3d 848, 859 (9th Cir. 2001) ("We do not believe that a defendant can escape the application of the serious risk of injury enhancement by claiming that he was not aware that his conduct created a serious risk, that is, a defendant does not have to subjectively know that his conduct created the risk.").  And while Chin is right that two courts of appeals have ruled to the contrary and interpreted § 2B1.1(b)(16)(A) to require actual, subjective awareness of a risk, see United States v. Mohsin, 904 F.3d 580, 586 (7th Cir. 2018); United States v. McCord, Inc., 143 F.3d 1095, 1098 (8th Cir. 1998), neither of those courts explains how that interpretation accords with the enhancement's use of the words "conscious or" before "reckless."  See Johansson, 249 F.3d at 858 ("Our concern with the Eighth Circuit's interpretation of 'reckless' [in McCord] . . . is that there is no meaningful distinction between an offense that involves the 'conscious' risk of injury, and an offense that involves the 'reckless' risk of injury, if under either prong the defendant must have been aware of the risk in the first place."); accord Maestas, 642 F.3d at 1320-21.[1]

---

[1] Chin does also point to the Eleventh Circuit's decision in United States v. Mateos, 623 F.3d 1350 (11th Cir. 2010), which applied the enhancement on the ground that the sentencing court had "f[ound] that a trained nurse, such as [the defendant] . . .,

- 14 -

Chin does point out that, although neither § 2B1.1(b)(16)(A) nor its application notes define the term "reckless," a definition of that word does appear elsewhere in the Guidelines. He then argues that we thus must apply that definition of "reckless" here.

Chin has in mind the definition of "reckless" that appears in the application notes to the Guideline that concerns involuntary manslaughter. See U.S.S.G. § 2A1.4. That Guideline sets different base offense levels for involuntary manslaughter depending on whether "the offense involved criminally negligent conduct; or . . . the offense involved reckless conduct; or . . . the offense involved the reckless operation of a means of transportation." Id. The application note to that Guideline, in turn, defines "reckless" as follows:

> "Reckless" means a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation.

would be well aware" of the risks associated with her criminal activity, id. at 1371. But, as the government observes, this standard more closely resembles a should-have-known standard than an actual awareness standard. Moreover, insofar as the Eleventh Circuit meant to embrace an actual-awareness-of-risk requirement in Mateos, see id. ("the Guidelines provision focuses on the defendant's disregard of risk"), it, too, made no attempt to explain how such a requirement could be reconciled with the Guideline's text.

Id. § 2A1.4 cmt. n.1.  The application note also explains that "'[c]riminally negligent' means conduct that involves a gross deviation from the standard of care that a reasonable person would exercise under the circumstances, but which is not reckless."  Id.

But, the application note that sets forth this definition of "reckless" in connection with the Guideline that concerns involuntary manslaughter does not purport to apply throughout the Guidelines.  Nor does it even purport to apply to the Guideline at issue here in particular, which applies to fraud and certain related offenses.  Thus, the application note does not, by its terms, require us to apply the definition of "reckless" that it sets forth here.

Moreover, it is problematic to apply that definition here as a textual matter.  The definition of "reckless" in the involuntary manslaughter Guideline refers to a "risk."  See U.S.S.G. § 2A1.4 cmt. n.1.  It is thus hard to see how that definition could have been intended to apply to this Guideline, because this Guideline itself uses the word "reckless" to modify the word "risk."  No such awkwardness arises under the involuntary manslaughter Guideline; it uses the adjective "reckless" to describe a defendant's conduct -- either "reckless conduct" or "reckless operation of a means of transportation," U.S.S.G. § 2A1.4.  See Maestas, 642 F.3d at 1321 (observing the distinction

between the two Guidelines' respective uses of "reckless conduct" and "reckless risk"); Johansson, 249 F.3d at 859 ("The Guideline describes a 'reckless risk,' not a reckless disregard of a known risk.").[2]

Chin separately argues that -- the definition of "reckless" elsewhere in the Guidelines aside -- the term as it appears in the enhancement at issue here is best construed to require the defendant to be aware of the risk of death or serious bodily injury. He relies for this contention in part on other instances in which recklessness has been defined to require a

---

[2] Chin draws our attention to a case in which this Court relied on the definition of "reckless" from the involuntary manslaughter Guideline when interpreting a third Guideline's use of that word. See United States v. Carrero-Hernández, 643 F.3d 344, 348–50 (1st Cir. 2011). There, this Court was tasked with interpreting a Guideline that provided for an increased offense level "if the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer," U.S.S.G. § 3C1.2, whose application note expressly imported the definition of "reckless" from the Guideline on involuntary manslaughter, id. cmt. n.2; see also Carrero-Hernández, 643 F.3d at 348. But, even setting aside the fact that in that case -- unlike this one -- the Guideline in question expressly incorporated the definition of "reckless" set out in the application note to § 2A1.4, Carrero-Hernández illustrates why the text of Chin's enhancement compels a different construction of the word "reckless." The provision at issue in Carrero-Hernández, like the involuntary manslaughter Guideline, used "reckless[]" to describe how an offender engaged in risky conduct. See U.S.S.G. § 3C1.2 ("If the defendant recklessly created a substantial risk . . ."); id. § 2A1.4 ("if the offense involved reckless conduct . . ."). By contrast, as we have explained, "reckless" in § 2B1.1(b)(16)(A) describes expressly a "risk," not the way an offender conducted himself with respect to that risk. See id. § 2B1.1(b)(16)(A).

defendant's subjective awareness of a risk. See Voisine v. United States, 579 U.S. 686, 694, 699 (2016) (describing reckless conduct as "acts undertaken with awareness of their substantial risk of causing injury" and "with conscious disregard of a substantial risk of harm"); Farmer v. Brennan, 511 U.S. 825, 836-37 (1994) ("The criminal law . . . generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware.").

But, in those instances, the term defines the mens rea element of a criminal offense, see Voisine, 579 U.S. at 691; Farmer, 511 U.S. at 836-37, which must be proved beyond a reasonable doubt.[3] Here, however, the term appears in a sentencing enhancement, which is subject only to the lower preponderance of the evidence standard that also applies in the civil context. See United States v. Hernández-Negrón, 21 F.4th 19, 25-26 (1st Cir. 2021). Thus, the examples of "reckless" being given the stricter meaning on which Chin relies fail to show that this Guideline is best construed to incorporate a meaning of "reckless" that is used to define an element of a crime, rather than a meaning of

---

[3] Farmer was a civil Bivens action in which the Court held that "deliberate indifference," for the purposes of defining a violation of the Eighth Amendment, see Helling v. McKinney, 509 U.S. 25, 32 (1993), required actual knowledge and disregard of a risk, rather than merely an objective risk. 511 U.S. at 837, 839-40. The Court explained in so holding, however, that it was "adopt[ing]" what it called "subjective recklessness as used in the criminal law." Id. at 839-40.

"reckless" that is traditionally used in the civil context, which is the one the Second Circuit attributes to it in Lucien, 347 F.3d at 56-57. See Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 68 (2007) ("While 'the term recklessness is not self-defining,' the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" (quoting Farmer, 511 U.S. at 836)); see also id. at 68 n.18 ("Unlike civil recklessness, criminal recklessness also requires subjective knowledge on the part of the offender.").

We do not mean to suggest that the word "reckless" in a Guideline necessarily incorporates the traditional common-law understanding of the term in the civil context. But, given the use of the words "conscious or reckless" to modify risk in § 2B1.1(b)(16)(A), the text requires us to construe "reckless" here to refer to that standard.

**B.**

Chin argues in the alternative that the record fails to show by a preponderance of the evidence that his relevant conduct satisfied the objective standard for recklessness, even if that standard is the applicable one under this Guideline. Specifically, he contends that "[w]hile [he] was aware that there were deficiencies in testing and the condition of the compounding lab

. . ., it would have required rank speculation to foresee that those shortcomings would cause the vials of MPA to become contaminated with fungus, leading to a scourge of serious illness and death." We are not persuaded.

The District Court did not expressly set forth findings about the nature of the risk of which Chin should have been aware from his relevant conduct in committing his offense. However, we may look to the record of the sentencing hearing to ascertain the District Court's reasoning. Cf. United States v. Montero-Montero, 817 F.3d 35, 37 (1st Cir. 2016) ("To be sure, a sentencing court's rationale sometimes may be inferred from the sentencing colloquy and the parties' arguments (oral or written) in connection with sentencing.").

Notably, before applying the § 2B1.1(b)(16)(A) enhancement to Chin, the District Court explained that it "d[id] not want to retread ground that [it] covered yesterday." It is thus evident that the District Court was relying on the same rationale for applying this enhancement to Chin that it had relied on the day before in applying the enhancement to Cadden. And, at Cadden's resentencing, it had explained that the enhancement applied to Cadden because Cadden "preside[d] over" a "high-risk enterprise" at NECC

> despite warnings, signals, . . . incomplete
> testing, falsification of drug lab cleaning
> reports, . . . the appearance of mold and

- 20 -

other contaminants in the clean room, and his superior knowledge of the risk involved.

Of course, the record in Chin's case must provide support for the District Court's decision to apply the enhancement to him based on this same rationale. But, reviewing the District Court's factfinding for clear error, Chin I, 965 F.3d at 50, we conclude that the record here supportably shows that Chin knew in 2012 that NECC's clean room was grossly contaminated after his staff's failure to adhere to cleaning protocols, that he knew that NECC was selling MPA that was not properly sterilized or tested for sterility despite claiming that it was USP-797 compliant, and that he instructed NECC technicians to mislabel untested drugs with the lot numbers of older lots that NECC had tested. And, as the government points out, the record also supportably shows that Chin was required to follow USP-797 standards, the purpose of which "is to describe conditions and practices to prevent harm, including death, to patients that could result from . . . microbial contamination." Thus, the District Court did not clearly err in finding that Chin should have been aware of the risk of death or serious bodily injury that his conduct in committing his offense posed, given the evidence supportably showing that he breached USP-797 standards that exist in part to "prevent . . . death . . . to patients."

We next address Chin's contention that the District Court erred in applying an enhancement to his sentence that provides for a two-level increase "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1).[4] The application note further explains that the enhancement "applies to offenses involving an unusually vulnerable victim." Id. § 3A1.1 cmt. n.2. To apply the "vulnerable victim" enhancement, "the sentencing court must determine that (1) 'the victim of the crime was vulnerable, that is, . . . the victim had an "impaired capacity . . . to detect or prevent crime;"' and (2) 'the defendant knew or should have known of the victim's unusual vulnerability.'" United States v. Stella, 591 F.3d 23, 29 (1st Cir. 2009) (quoting United States v. Donnelly, 370 F.3d 87, 92 (1st Cir. 2004)).

Chin does not dispute that the patients who were administered NECC drugs are "victims" in the relevant sense. See United States v. Bradley, 644 F.3d 1213, 1288 (11th Cir. 2011) (concluding that "recipients of recycled blood-derivatives are

---

[4] U.S.S.G. § 3A1.1(b)(2) provides, "[i]f (A) subdivision (1) applies; and (B) the offense involved a large number of vulnerable victims, increase the offense level determined under subdivision (1) by 2 additional levels." The District Court applied this enhancement at Chin's resentencing. Chin does not argue that the District Court erred in applying the additional enhancement in § 3A1.1(b)(2) if the District Court properly applied the enhancement in § 3A1.1(b)(1).

'vulnerable victims'" where owner of pharmaceutical wholesaler's fraudulent billing scheme caused AIDS and hemophilia patients to be treated with recycled blood derivatives); United States v. Milstein, 401 F.3d 53, 74 (2d Cir. 2005) (affirming application of "vulnerable victims" enhancement where defendant "distribute[d] counterfeit and misbranded drugs to doctors, pharmacists, and pharmaceutical wholesalers, knowing that those customers would distribute the drugs to women with fertility problems and to Parkinson's disease patients"); see also United States v. Sidhu, 130 F.3d 644, 655 (5th Cir. 1997) ("[A] physician's patients can be victimized by a fraudulent billing scheme directed at insurers or other health care providers."). But, he still argues that neither prong of the enhancement is satisfied here. Reviewing the District Court's factfinding for clear error and its interpretation of the Guidelines de novo, Chin I, 965 F.3d at 50, we do not agree.

## A.

Chin contends that the victims here -- i.e., the patients harmed by contaminated NECC drugs -- "were not 'unusually vulnerable'" merely because they were members of "a generic class of all medical patients." He further contends that such a finding would be inconsistent with the intent and purpose of the Guideline, which he says is meant to punish "defendants who exploit the particular weaknesses of society's most vulnerable members." To

the extent Chin contends that the District Court erred in its interpretation and application of the Guideline, we disagree under de novo review. To the extent he challenges the District Court's factual finding that the victims at issue were in fact "unusually vulnerable," we discern no clear error.

The District Court did not find, as Chin suggests, that these victims were unusually vulnerable merely because they belonged to "a generic class of all medical patients." Rather, the District Court supportably found that they were unusually vulnerable because their pain led them to "entrust medical personnel to inject a foreign substance into their spine[s]," recognizing that "vulnerability can equally refer to one's . . . inability to protect one's self under the circumstances." Applying the enhancement based on particularized class characteristics such as these is consistent with our precedent. Although we have said that the sentencing court should focus "on the victim's individual characteristics" in applying this enhancement, "above and beyond mere membership in a large class," see United States v. Feldman, 83 F.3d 9, 15 (1st Cir. 1996), we have also made clear that "this is in no way a fixed rule," United States v. Gill, 99 F.3d 484, 486-87 (1st Cir. 1996). Indeed, "[i]n some cases the inference to be drawn from the class characteristics may be so powerful that there can be little doubt about unusual vulnerability of class members within the meaning of section 3A1.1." Id. at 487 (citing

United States v. Echevarria, 33 F.3d 175, 180-81 (2d Cir. 1994) (upholding enhancement as applied to unlicensed doctor based on group determination of vulnerability of medical patients), superseded by regulation on other grounds as stated in United States v. Hussey, 254 F.3d 428, 433 n.3 (2d Cir. 2001), and United States v. Bachynsky, 949 F.2d 722, 735 (5th Cir. 1991) (same, as applied to physician making false diagnoses)). Thus, reviewing de novo, we conclude that the District Court did not err in interpreting the Guideline.

Nor do we find any clear error in the District Court's application of the Guideline to Chin. Indeed, we have upheld the application of the enhancement in similar circumstances: in Stella, we held that victims' "illnesses" can distinguish them from members of the "general public" for purposes of the vulnerable-victim enhancement, insofar as their need for medication vitiates their ability to "help themselves" or "to detect or prevent against the [relevant harm]." 591 F.3d at 30 (quoting the sentencing court's findings). Cf. Bradley, 644 F.3d at 1289 (concluding that victims "were vulnerable due to their medical condition -- AIDS and hemophilia"); Milstein, 401 F.3d at 74 (concluding that "women with fertility problems and . . . Parkinson's disease patients" constituted vulnerable victims). Here, the patients receiving MPA injections into their spine were in a similarly "unusually vulnerable" position, see U.S.S.G.

§ 3A1.1 cmt. n.2, by virtue of their physical condition and the circumstances of the procedure. Thus, we discern no error in the District Court's application of the enhancement.

## B.

Chin also argues that the record fails to show that Chin knew or should have known of the victims' unusual vulnerability. In support of this contention, Chin appears to argue that the "knew or should have known" requirement in § 3A1.1(b) per se precludes the enhancement's application to him because he was merely a supplier of medical products to health care facilities and thus stood at a remove from the patients who were harmed by the contaminated drugs that NECC compounded. But, insofar as Chin in pressing this contention is making a legal argument about the proper construction of the Guideline, such that our review is de novo, see Chin I, 965 F.3d at 50, we must reject the contention.

Nothing in the text of the provision supports the per se exclusion of medical suppliers. Thus, nothing in the text bars the application of the enhancement to a medical supplier who knew or should have known that he was distributing unsafe drugs that would be used by vulnerable patients. See Bradley, 644 F.3d at 1289; Milstein, 401 F.3d at 74; see also United States v. Moran, 778 F.3d 942, 952-53, 978-79 (11th Cir. 2015) (applying "vulnerable victim" enhancement to defendant CEO of medical facility who was not directly involved in patient care). Rather, the text merely

- 26 -

provides that the enhancement applies to an offender who "knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b).

Chin next argues that the enhancement may not be applied to him by referencing the application note to it. The application note explains that "[t]he adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure." U.S.S.G. § 3A1.1 cmt. n.2. Chin contends that, in addition to the fact that he was not himself "a health care provider," he also is not analogous to a fraudster who marketed an ineffective cancer cure. And that is so, Chin contends, because NECC had previously sold lots of MPA without incident, and the record fails to show by a preponderance of the evidence that he "kn[e]w that any of the drugs he compounded were contaminated." He thus appears to be contending that, absent a showing by a preponderance of the evidence of his intent to defraud the victims, there can be no finding that Chin knew or should have known that the victims were vulnerable.

But, even if we understand this argument to be a contention about the proper way to construe the Guideline, such that our review is de novo rather than for clear error, Chin I, 965 F.3d at 50, we reject it. The text of the Guideline provides no basis for concluding that the "knew or should have known" standard may be satisfied only by a finding that the defendant

- 27 -

intended to defraud his victims. Nor does the application note, in giving an example of how the Guideline could be satisfied, purport to suggest that there is a requirement to prove an intent to defraud. Instead, the Guideline merely requires that it be shown by a preponderance of the evidence that, in engaging in the conduct relevant to his offense, Chin knew or should have known that vulnerable patients would be using the unsafe drugs he produced at NECC.

Finally, Chin appears to be arguing that, even if the Guideline may be applied to a medical supplier who was not defrauding patients, the District Court clearly erred in finding that he "knew or should have known" that the victims were vulnerable. Here, his assertion is that there is an absence of record evidence of his individualized knowledge of both who the end users of NECC drugs would be and that the drugs that NECC shipped were contaminated. But, we cannot agree.

The District Court supportably found that "[e]vidence introduced at trial, including internal NECC emails, brought home the certainty that Chin and other of the coconspirators were fully aware of the risks involved in the distribution of defective drugs." Chin's resume advertised his "[k]nowledge of USP[-]797," and the first sentence of the introduction to USP-797 reads, "[t]he objective of this chapter is to describe conditions and practices to prevent harm, including death, to patients that could result

- 28 -

from . . . microbial contamination . . . ." And, Chin himself concedes in his brief to us that he "was aware that there were deficiencies in testing and the condition of the compounding lab and that all the USP-797 protocols were not being strictly adhered to." Indeed, evidence was presented at trial that tended to show that Chin was aware of the particularly grave risks associated with injecting contaminated medication into a patient's spinal fluid, as opposed to other routes of drug administration.[5] Thus, the District Court did not clearly err in concluding that Chin knew or should have known that downstream recipients of MPA from NECC were particularly vulnerable.

## IV.

For the foregoing reasons, we <u>affirm</u> Chin's sentence.

---

[5] An NECC compounding technician testified that Chin, when training him in clean-room sanitation practices, "stressed that with the injectable drugs [there] was even more a need to be vigilant in terms of cleanliness because you're bypassing the immune system, basically injecting it right into the cerebral spinal fluid, whatever it is, and it's going to go straight up into their brain." Additionally, the second sentence of the introduction to USP-797 explains that "[c]ontaminated [compounded sterile preparations] are potentially most hazardous to patients when administered into body cavities, central nervous and vascular systems, eyes, and joints and when used as baths for live organs and tissues."